This is a mother's action for the death of her four-year-old son, Daniel Dunaway. Daniel was at Real Island Marina on Lake Martin with his father, who was divorced from plaintiff, when Daniel drowned. Suit was filed against Daniel's father; his father's employer (the alleged sponsor of a company picnic at the time Daniel drowned); David E. Garner d/b/a Real Island Marina (the lessee and operator of Real Island Marina); and Alabama Power Company (the lessor of Real Island Marina). Summary judgment was granted for Daniel's father and his employer. Plaintiff entered into a pro tanto settlement with Garner.[1] At trial Alabama Power Company ("APCO") was the only defendant. The two theories of negligence submitted to the jury were (1) a breach of a duty to maintain the premises at Real island Marina in a safe condition, by allowing Garner to locate a picnic pavilion near a seawall on which there were no guardrails to prevent persons from inadvertently falling into the water, and (2) a breach of a duty to require Garner to employ lifeguards. From a verdict for the plaintiff, APCO appeals.
Lake Martin was created by the construction of Martin Dam across the Tallapoosa River by APCO pursuant to a license which it acquired in 1923. APCO held a 50-year license to operate a hydroelectric facility at Lake Martin; that license expired in 1973 and was renewed in 1978 by the Federal Energy Regulatory Commission. There are 21 public recreation facilities on Lake Martin, 5 of which are on land owned by APCO. One of the commercial recreation facilities located on APCO land is Real Island Marina.
Real Island Marina was leased by APCO to Earl Crutchfield who, on October 15, 1976, assigned his lease to one of the defendants, David Garner. The premises were leased for use as a commercial campsite and for other recreational purposes. APCO had no obligation to repair under this lease. Garner's rent was based upon a flat rate calculated solely on the number of structures located on the premises. Dan Capps, supervisor of recreational development for APCO, was Garner's liaison with APCO. Capps made an annual rental inspection and was responsible for determining whether Garner was operating Real Island Marina as a "commercial campsite." The results of the inspection were required *Page 728 
to be reported to the Federal Energy Regulatory Commission ("FERC"). In November 1978, APCO approved the location and construction of a picnic pavilion located approximately 30 feet from the water. APCO also approved the building of several seawalls along the edge of the lake at Real Island Marina.
Prior to Daniel's death, there were no designated swimming areas at Real Island Marina. Adults and children usually swam anywhere that the water was shallow. Garner had no lifeguards at the Marina, and he had posted a sign reading "Danger, swim at your own risk." Prior to Daniel's death, no one had ever drowned at Real Island Marina.
David Dunaway, Daniel's father, took his two sons and his mother camping at Real Island Marina on May 22, 1982. They spent that night in a camper about 20 feet from the water's edge. The next morning, David took his two sons swimming. Daniel could not swim. Later in the day, Daniel, who had changed from his bathing suit to his regular clothing, was with his father under the picnic pavilion for a company picnic. There was a crowd of people in the pavilion, some between the pavilion and the water's edge, and approximately 75 people in the water. Daniel disappeared. A few minutes later David Dunaway began searching for his son, and Daniel's body was found floating in the lake. He had drowned. No one observed Daniel enter the lake, and there was no direct evidence as to how, when, where, or why Daniel had entered the lake.
APCO was a landlord who leased all of the area comprising Real Island Marina to Garner prior to this tragic accident. Daniel and his father were Garner's invitees at Real Island Marina at the time of the accident.
Alabama's longstanding rule on landlord liability is concisely stated in Sanders v. Vincent, 367 So.2d 943 (Ala. 1978), where an action was brought by a car wash employee for injuries sustained on premises which the landlord had rented to the plaintiff's employer. We wrote:
"The rule in Alabama is:
 " '[A]s to the tenant, his servant, guest or others entering under his title, in the absence of a covenant to repair, . . . the landlord is only liable for injuries resulting from latent defects, known to him at the time of the leasing, and which he concealed from the tenant.' Southern Apartments, Inc. v. Emmett, 269 Ala. 584, 114 So.2d 453
(1959)." (Emphasis added.)
This Alabama law on landlord liability was reaffirmed by this Court in Collier v. Duprel, 480 So.2d 1196 (Ala. 1985), where the plaintiff broke his leg by tripping over an orange electrical cord supplying electricity to display signs at a lounge, operated by a lessee. We affirmed summary judgment in favor of the landlord, observing that the contention that the landlord knew of the existence of the electrical cord was irrelevant, because the alleged "defect" was not a "latent" one, which was defined as "a hidden or concealed defect, one which could not be discovered by reasonable and customary inspection."
Under these principles there is simply no factual basis for liability of APCO as landlord under either of the plaintiff's theories of negligence. The picnic pavilion and seawall were built by the lessee (Garner) and if there were a "defect" arising from the pavilion's proximity to the water, it was obvious to any observer. This was no "latent" defect. The testimony showed that the plaintiff, as well as Daniel's father, had been to Real Island Marina with Daniel and both knew of the location of the pavilion with respect to the water and of the absence of guardrails on the seawall. There were no lifeguards at the marina, and Garner had erected a sign reading "Danger, swim at your own risk." The lack of lifeguards is a condition which could have been discovered by Garner's invitees by their reasonable and customary inspection. Therefore, this was not a "latent defect." Collier v. Duprel, supra.
The mere fact that APCO as landlord knew of the location of the pavilion in *Page 729 
relation to the seawall and knew of the absence of guardrails on the seawall is irrelevant, because this "defect" was not a latent one. Collier v. Duprel, supra. The same rule would apply as to the absence of lifeguards.
Plaintiff contends that APCO's liability was more extensive than that of a normal landlord because of (1) its reservation of control in the lease to Crutchfield, which was assigned to Garner; and (2) its obligations under its Federal Energy Regulatory Commission license. We disagree.
Real Island Marina was leased to Garner. The term was ten years. APCO reserved the right to cut and remove timber from any part of the land, but not only disclaimed liability for any claim for damages to property or injury to persons resulting from the falling of any limb or tree but received a promise of indemnification from Garner for any such claim. APCO reserved the right to utilize any part for the leased premises for electric transmission lines and other facilities necessary or useful in its public utility business but not if they unreasonably interfered with Garner's use of the leased premises as a commercial campsite. APCO could prescribe additional rules and regulations for Garner to comply with if APCO deemed the "laws applicable to the use of the leased premises" inadequate.
There was no evidence that APCO had done so prior to Daniel's drowning, for the protection of the public peace, health, and safety. As a matter of law, none of these reservations imposed upon APCO as landlord any duty greater than the duty which the law of this state imposes upon landlords generally. Sanders v.Vincent, supra; Collier v. Duprel, supra.
In determining whether APCO's duty was more extensive than that of a normal landlord by virtue of certain regulations relating to APCO's FERC license, it is necessary to review the June 2, 1981, FERC "Order Approving Revised Exhibit R" and particularly Article 59 thereof. The relevant portions of that article provide as follows:
 "Article 58. (a) In accordance with the provisions of this article, the Licensee shall have the authority to grant permission for certain types of use and occupancy of project lands and waters and to convey certain interests in project lands and waters for certain other types of use and occupancy, without prior Commission approval. The Licensee may exercise the authority only if the proposed use and occupancy is consistent with the purposes of protecting and enhancing the scenic, recreational, and other environmental values of the project. For those purposes, the Licensee shall also have continuing responsibility to supervise and control the uses and occupancies for which it grants permission, and to monitor the use of, and ensure compliance with the covenants of the instrument of conveyance for, any interests that it has conveyed, under this article. If a permitted use and occupancy violates any condition of this article or any other condition imposed by the Licenseee for protection and enhancement of the project's scenic, recreational, or other environmental values, or if a covenant of a conveyance made under the authority of this article is violated, the Licensee shall take any lawful action necessary to correct the violation. For a permitted use or occupancy, that action includes, if necessary, cancelling the permission to use and occupy the project lands and waters and requiring the removal of any non-complying structures and facilities.
 "(b) The types of use and occupancy of project lands and waters for which the Licensee may grant permission without prior Commission approval are: (1) landscape plantings; (2) noncommercial piers, landings, boat docks, or similar structures and facilities; and (3) embankments, bulkheads, retaining walls, or similar structures for erosion control to protect the existing shoreline. To the extent feasible and desirable to protect and enhance the project's scenic, recreational, and other environmental values, the Licensee shall require multiple use *Page 730 
and occupancy of facilities for access to project lands or waters. The Licensee shall also ensure, to the satisfaction of the Commission's authorized representative, that the uses and occupancies for which it grants permission are maintained in good repair and comply with applicable State and local health and safety requirements."
If this Article 58 applies to Real Island Marina facilities at all (which it is not necessary for us to decide in this case), there is no evidence that Daniel's death was the result of any violation by APCO of the terms of this Article. In order to impose upon a defendant in a tort case the requirements of a statute, we held in Fox v. Bartholf, 374 So.2d 294 (Ala. 1979), that the statute must meet the following four criteria. By analogy, the same should apply to an administrative regulation, Restatement (Second) of Torts, § 286 (1965), and we hereby hold that they do. The four criteria which the statute or regulation must meet in order for its violation to impose liability upon a defendant are:
(1) The trial judge must determine as a matter of law that the statute was enacted, or the regulation promulgated, to protect a class of persons which includes the litigant seeking to assert the statute. (The Court will not apply the statutory or regulatory standard in a tort case if its purpose was to secure to individuals the enjoyment of rights and privileges to which they are entitled only as members of the public.Restatement (Second) of Torts, § 288.)
(2) The trial judge must find the injury was of the type contemplated by the statute or regulation.
(3) The party charged with negligent conduct must have violated the statute or regulation.
(4) The jury must find that the statutory or regulatory violation proximately caused the injury.
With regard to factors one and two above, the language of Article 58 makes it clear that it was adopted for the purpose of promoting the interests of the public generally in scenic, recreational, and other environmental values. There is nothing to indicate an intent to require APCO to be responsible for eliminating inherent hazards to particular classes of individuals who might use the project lands for specializedpurposes such as swimming, water skiing, bird watching, or boating. It is also clear that factors three and four are not present in this case. There are two operative portions of Article 58 upon which the plaintiff must rely to render Article 58 relevant. One such provison in subparagraph (b) provides as follows:
 "The Licensee [APCO] shall also ensure, to the satisfaction of the Commission's authorized representative, that the uses and occupancies for which it grants permission are maintained in good repair and comply with applicable State and local health and safety requirements." (Emphasis added.)
There is no evidence in the record that the accident was a result of any facility's not being "in good repair." Further, there is no evidence that the picnic pavilion, or any other facility at the Real Island Marina, did not meet with the full satisfaction of FERC or any of its representatives, or did not comply with all applicable state and local health and safety requirements. All evidence showed that there had never been any complaint, citation, or adverse matter of any kind concerning any condition prevailing at the Real Island Marina. There areno applicable state or local regulations or requirements with regard to the distance of the pavilion from the water, the lack of a guardrail on the seawall, or the lack of lifeguards. The plaintiff, it appears, introduced no evidence of any, and we have not been directed by the parties to any. The trial judge properly charged the jury that there are no such regulations in existence.
Since the plaintiff can show no violation of subparagraph (b), then to render Article 58 relevant, the plaintiff must rely upon the following sentences appearing in subparagraph (a): *Page 731 
 "The Licensee may exercise the authority [to authorize certain uses without prior Commission approval] only if the proposed use and occupancy is consistent with the purposes of protecting and enhancing the scenic, recreational, and other environmental values of the project. For those purposes, the Licensee shall also have continuing responsibility to supervise and control the uses and occupancies for which it grants permission, and to monitor the use of, and ensure compliance with the covenants of the instrument of conveyance
for, any interests that it has conveyed, under this article."
The first-quoted sentence describes the types of uses which APCO may authorize without prior Commission approval, i.e., those consistent with scenic, recreational, and other environmental values. There is no evidence that Real Island Marina did not enhance scenery, recreation, and the environment. The Real Island Marina facilities were approved by FERC in its "Order Approving Revised Exhibit R" of June 2, 1981. The second-quoted sentence imposes upon APCO the responsibility to supervise the use of the premises toinsure compliance with the covenants of its lease with Garner.
A review of the terms of that lease, as previously discussed, discloses no covenant or other provision which was violated by Garner, either in regard to the picnic pavilion location, the seawall arrangement, or the lack of lifeguards or of a supervised, designated swimming area.
There is simply no basis for liability of APCO as landlord under either of plaintiff's two theories of negligence, and it was reversible error for the trial court to overrule APCO's motion for directed verdict and to deny APCO's motion for JNOV.
There is no need to discuss whether the trial court erred to reversal in its instructions to the jury, other than to reiterate that (1) the determination as to the existence vel non of a duty resting upon a defendant is always an issue of law for the trial court and never one for the jury. Sungas,Inc. v. Berry, 450 So.2d 1085 (Ala. 1984); and (2) it is error for the trial court to leave the jury in a state of confusion as a result of conflicting or contradictory charges. Cunninghamv. Lowery, 45 Ala. App. 700, 236 So.2d 709, cert. denied,286 Ala. 784, 236 So.2d 718 (1970). Russell v. Thomas, 278 Ala. 400, 178 So.2d 556 (1965).
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
TORBERT, C.J., and MADDOX, ALMON and BEATTY, JJ., concur.
[1] David Garner died on January 28, 1985, and on April 12, 1985, Doris Garner, as executrix of his last will and testament, was substituted as a party defendant.