624 So.2d 1346 (1993)
Gina GARNER, as the mother of Jonathan Garner, a deceased minor
v.
COVINGTON COUNTY and City of Opp.
CITY OF OPP
v.
Gina GARNER, as the mother of Jonathan Garner, a deceased minor.
CITY OF OPP
v.
Ruth OWENS.
CITY OF OPP
v.
Sharon DAVIS.
1911100, 1911105, 1911150 and 1911151.
Supreme Court of Alabama.
June 25, 1993.
Rehearing Denied August 13, 1993.
*1347 J. Keith Givens and J. Farrest Taylor of Cherry, Givens, Peters, Lockett & Diaz, P.C., Dothan, for appellant/cross-appellee Gina Garner.
John B. Givhan and William B. Alverson, Jr. of Albrittons, Givhan, Clifton & Alverson, Andalusia, for appellee/cross-appellant City of Opp.
Peter A. McInish of Lee & McInish, Dothan, and W. Sidney Fuller, Andalusia, for Covington County.
James H. Evans, Atty. Gen., and Marc Givhan, Deputy Atty. Gen., for State.
Frank J. Tipler, Jr. and James Harvey Tipler of Tipler and Tipler, Andalusia, for Ruth Owens and Sharon Davis.
James W. Webb and Bart Harmon of Webb, Crumpton, McGregor, Davis & Alley, Montgomery, for amicus curiae Ass'n of County Commissions of Alabama.
Jack Drake of Drake & Pierce, Tuscaloosa, and Bruce McKee of Hare, Wynn, Newell & Newton, Birmingham, for amicus curiae Alabama Trial Lawyers Ass'n.
Ken Smith, League counsel, Alabama League of Municipalities, amicus curiae in support of appellees.
ALMON, Justice.
These appeals arise from wrongful death and personal injury actions filed by Gina Garner, Sharon Davis, and Ruth Owens against the City of Opp and Covington County. The plaintiffs alleged that the defendants had negligently maintained a stop sign at an intersection and had thereby caused an automobile accident in which Davis and Owens suffered injuries and Garner's minor son was killed. The jury returned verdicts in favor of Covington County in all three actions, and returned verdicts against Opp awarding Davis $42,000 and Owens $100,000 in their personal injury actions, and awarding Garner $750,000 in her wrongful death action based on the death of her minor son. The trial court reduced the $750,000 verdict to $100,000 pursuant to Ala.Code 1975, § 11-93-2, and entered judgments for the plaintiffs.
Opp, in the appeals numbered 1911105, 1911150, and 1911151, appeals from the trial court's denial of its motion for j.n.o.v. Opp specifically argues that the trial court erred because, it says, the plaintiffs failed to prove that the actions of Opp were the proximate cause of the injuries and the death. Opp also argues that the trial court erred in instructing the jury that Opp, as a matter of law, had a legal duty to maintain the intersection.
Gina Garner also raises several issues in her appeal, number 1911100. Garner first argues that the trial court erred in submitting to the jury the question of whether Covington County had a duty to maintain the intersection. Garner also argues that the trial court erred in failing to give her requested jury instruction as to the duty of the county. Last, Garner challenges the constitutionality of the $100,000 "cap" imposed by Ala.Code 1975, § 11-93-2, on the recovery of damages against governmental entities.
The facts leading up to the institution of these actions are as follows:
On August 12, 1988, Sharon Davis and her mother, Ruth Owens, travelled by automobile from Luverne to Opp to pick up Davis's niece and nephew and bring them back to Luverne. Because Davis had never been to Opp before, she met her brother on Highway 331 and followed him into town. Davis's brother travelled southward on Maloy Street; both he and Davis stopped at the intersection of Maloy Street and Old Perry Store Road. After picking up the children, Davis returned by the same route, approximately one hour later, this time heading northward on Maloy Street.
*1348 As Davis approached the intersection of Maloy Street and Old Perry Store Road, she slowed her automobile but failed to come to a complete stop. There was a stop sign at the intersection, but it was covered by a red crape myrtle bush and was not visible. As Davis entered the intersection, her car was struck by a truck heading westward on Old Perry Store Road. Davis's 19-month-old nephewwho was Gina Garner's sonwas thrown from the car and suffered fatal injuries. Davis and Ruth Owens also suffered substantial injuries from the accident. Neither Davis nor Owens has any memory of the accident.
At trial, Davis testified that she never saw a stop sign at the intersection. The plaintiffs introduced photographs of the intersection taken by a witness who appeared on the scene immediately after the accident. These photographs illustrate that the stop sign was not visible to Davis when she entered the intersection, and this fact is substantially undisputed. The plaintiffs also questioned Keith Wilson, a witness who had followed Davis as she drove northward on Maloy street toward the intersection. Wilson testified that Davis slowed down considerably before entering the intersection, but that her brake lights never came on and she never completely stopped.
The defendants introduced deposition testimony in which Davis stated that she had seen the back of the stop sign and had recognized it as a stop sign when she had stopped at the Maloy Street/Old Perry Store Road intersection on the way into town. The defendants also questioned John Bryan, a policeman who spoke with Davis at the hospital soon after the accident. Bryan testified that Davis told him that she thought she had run a stop sign immediately before being struck by the truck.
After the close of the evidence, the jury returned verdicts in favor of the plaintiffs against Opp; the jury found in favor of Covington County. The trial court subsequently reduced Garner's verdict of $750,000 to $100,000, pursuant to § 11-93-2.
Opp argues that its motion for j.n.o.v. should have been granted because, it argues, the plaintiffs failed to prove that the failure of Opp to maintain the intersection was the proximate cause of the injuries and the death. Opp asserts that Davis knew of the stop sign before she entered the intersection and merely failed to stop. Opp also contends that testimony of Davis or Owens as to the cause of the accident is necessary to the maintenance of the action. Because neither Davis nor Owens could testify as to causation, Opp contends that any attempt to establish causation is mere conjecture. Opp relies heavily on Smoyer v. Birmingham Area Chamber of Commerce, 517 So.2d 585 (Ala. 1987), and Peoples v. Town of Ragland, 583 So.2d 221 (Ala.1991), to support this argument.
The facts of Smoyer and Peoples are, however, distinguishable from those in this case. In Smoyer, the plaintiff's car was struck by a car leaving a hotel driveway and entering the highway. He brought an action alleging that the hotel driveway had been negligently designed and maintained. This Court held that there was simply no causal connection between any negligence of the hotel and the plaintiff's injury. We specifically pointed out that no one could testify that the person leaving the hotel did not stop; therefore, it was impossible to infer that the condition of the driveway contributed to the accident. Here, Wilson did testify that Davis did not come to a complete stop before entering the intersection. Also, there is evidence from which the jury could reasonably conclude that the obstructed stop sign was the immediate cause of the injury, while in Smoyer the accident occurred well after the driver had exited the hotel driveway.
In Peoples, this Court held that the plaintiff failed to establish that the lack of a traffic control device at an intersection proximately caused her injuries. Although we did find it significant that the plaintiff was unable to testify as to the cause of the wreck because of memory loss, the issue ultimately turned on the actions of the plaintiff: she accelerated into the oncoming traffic after "creeping out" into the intersection to see beyond a wall that blocked her view. Therefore, neither Peoples nor Smoyer compels a holding that the plaintiffs here failed to establish proximate cause as a matter of law. Also, *1349 neither case stands for the proposition that one injured in an accident must testify as to causation to be entitled to recover.
The question of proximate causation is ordinarily one for the jury, if reasonable inferences from the evidence support the plaintiff's theory. Marshall County v. Uptain, 409 So.2d 423 (Ala.1982). Here the question is particularly suited for the jury because of the conflicting nature of the evidence. While the defendants did produce evidence tending to show that Davis knew of the existence of the sign, the jury was justified in inferring that Davis did not know of the sign. For example, the fact that Davis slowed down considerably before entering the intersection does not, ipso facto, establish that she knew the stop sign was there. Motorists who are unfamiliar with particular routes may merely have a tendency to slow down before entering any unmarked intersection. Furthermore, the fact that, after the accident, she stated to Officer Bryan that she thought she had run a stop sign does not establish as a matter of law that she knew the stop sign was there as she entered the intersection. Therefore, we hold that the trial court did not err by denying Opp's motion for j.n.o.v.
Opp next argues that the trial court erred in instructing the jury that Opp, as a matter of law, had a duty to maintain the intersection, while submitting to the jury the question of Covington County's duty. Opp contends that this instruction unfairly prejudiced it in the jury's consideration and that it is entitled to a new trial.
Opp's argument is without merit. The trial court instructed the jury pursuant to Instruction 27.01, Alabama Pattern Jury Instructions (Civil). That instruction charges that municipalities have the duty of maintaining their streets in reasonably good condition; this has long been the law in Alabama. See Ala.Code 1975, § 11-47-190; Hale v. City of Tuscaloosa, 449 So.2d 1243 (Ala. 1984); Jacks v. City of Birmingham, 268 Ala. 138, 105 So.2d 121 (1958). Here, it is undisputed that the intersection is within the Opp city limits. Also, there was evidence that, before the accident occurred, Opp knew of the dangerous condition of the intersection. Based on these considerations, we hold that the trial court did not err in charging the jury as it did.
In appeal number 1911100, Garner raises several issues concerning the duty of Covington County to maintain the intersection.[1] Initially, Garner argues that the question of duty in a negligence action is always a question of law for the court, and that therefore the trial court committed reversible error by submitting to the jury the question of whether Covington County had a duty to maintain the intersection.
Garner is correct in saying that some of our cases have held that the duty issue is solely a question of law for the trial court. The strongest statement of this rule is in Sungas, Inc. v. Perry, 450 So.2d 1085 (Ala. 1984), where Justice Jones, writing for the majority, stated:
"The determination of any question of dutythat is, whether the defendant stands in such relation to the plaintiff that the law will impose upon him an obligation of reasonable conduct for the benefit of the plaintiffhas been held to be an issue of law for the court and never one for the jury."
450 So.2d at 1089 (quoting 57 Am.Jur.2d Negligence § 34 (1971)).[2] Other Alabama cases, however, have held that "[w]here the facts upon which the existence of a duty *1350 depends, are disputed, the factual dispute is for resolution by the jury." Alabama Power Co. v. Brooks, 479 So.2d 1169, 1175 (Ala.1985) (quoting Alabama Power Co. v. Alexander, 370 So.2d 252, 254 (Ala.1979)). We believe that the Brooks/Alexander formulation of this rule is preferable to the "bright-line" rule enunciated in Sungas.[3] Although the existence vel non of a duty is ordinarily a question of law for the court, it is not error to submit the question to the jury if the factual basis for the question is in sufficient dispute: to allow the trial court to determine such questions would undermine the traditional factfinding function of the jury. This is particularly true here, because the facts upon which a determination of Covington County's duty rests are in substantial dispute. We hold, therefore, that the trial court properly submitted the duty issue to the jury.
Garner next argues that the trial court erred in refusing to grant her motion for a new trial as to Covington County. Garner's argument is essentially that the jury's determination of the duty question in favor of Covington County is against the great weight of the evidence.
The test for determining whether a county or a municipality has a duty to maintain a roadway is whether it has a right to control, or to participate in the control, of the roadway. Maharry v. City of Gadsden, 587 So.2d 966, 968 n. 1 (Ala.1991); Harris v. Macon County, 579 So.2d 1295 (Ala.1991).[4] Here, the issue of Covington County's right to control, or to participate in the control of, the Maloy Street/Old Perry Store Road intersection was sharply disputed. There was evidence tending to show that Covington County did exercise a right of control. For example, the stop sign was on a right-of-way owned by Covington County; Covington County engaged in maintenance projects around the intersection; Covington County installed safety devices at the intersection after the accident; and portions of the testimony of Bill McClain, the Covington County engineer, suggested that the maintenance of the intersection was a joint undertaking.
McClain also testified, however, that Covington County had no understanding with Opp as to the maintenance of the intersection. He also testified that Maloy Street was not a county road; that all remedial measures undertaken by Covington County were undertaken solely at the request of Opp; and that Covington County had no notice before the accident of the dangerous condition of the intersection. In light of the contradictory evidence concerning Covington County's right to control the intersection, we hold that the trial court did not err in denying Garner's motion for new trial.[5]
Garner's final argument is that the trial court erred in reducing the $750,000 verdict to $100,000. She argues that Ala. Code 1975, § 11-93-2, contravenes the right to jury trial as guaranteed by Art. I, § 11, Alabama Constitution of 1901.
In pertinent part, § 11-93-2 provides:
"The recovery of damages under any judgment against a governmental entity shall be limited to $100,000.00 for bodily injury or death for one person in any single occurrence."[6]
Section 11 of the Constitution provides "That the right of trial by jury shall remain inviolate."
*1351 This Court, in Home Indemnity Co. v. Anders, 459 So.2d 836 (Ala.1984), rejected arguments that § 11-93-2 "violates the remedy provisions of Article I, § 13, and denies equal protection as guaranteed in Article I, § 1," of the Constitution. The Court quoted the following with approval from Stanhope v. Brown County, 90 Wis.2d 823, 842, 280 N.W.2d 711, 719 (1979):
"We are unwilling to say that the legislature has no rational basis to fear that full monetary responsibility entails the risk of insolvency or intolerable tax burdens. Funds must be available in the public treasury to pay for essential governmental services; taxes must be kept at reasonable levels; it is for the legislature to choose how limited public funds will be spent. It is within the legitimate power of the legislature to take steps to preserve sufficient public funds to ensure that the government will be able to continue to provide those services which it believes benefits the citizenry. We conclude that the legislature's specification of a dollar limitation on damages recoverable allows for fiscal planning and avoids the risk of devastatingly high judgments while permitting victims of public tortfeasors to recover their losses up to that limit."
459 So.2d at 841 (emphasis added).
This Court, in Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 165 (Ala.1991),[7] noted:
"We have never addressed a challenge to the validity of § 11-93-2 based on § 11. In Home Indemnity Co. v. Anders, 459 So.2d 836 (Ala.1984), we upheld § 11-93-2 against allegations that the section violated the open courts provision of § 13. We specifically declined to address the contention that the statute impaired the right to a jury trial, because that ground had not been pressed in the trial court. Id. at 840."
Garner's argument that § 11-93-2 violates § 11 must be addressed in the context of the unique status of counties and cities as governmental entities. Because they are creations of the sovereign, the State of Alabama, and because they exercise certain governmental functions that are dependent upon tax dollars, actions against them have always been subject to reasonable regulation by the legislature on a basis not applicable to actions against individuals and other entities.
This legislative power over municipalities and counties can be seen from the debates in the Constitutional Convention of 1901 regarding a provision that would have limited that power. The debates show that the delegates considered the regulation of municipal liability to be a matter particularly within legislative control. The committee on municipal corporations proposed a separate article on the subject.[8] In bringing the proposed article to the floor, Mr. Weakley, a member of the committee, made the following statement: "It has become manifest to the people of Alabama in the last two years that the question of municipal government is one of greatest public concern." Official Proceedings of the Constitutional Convention of the State of Alabama (1901), vol. III, p. 3688. Section 1 of the proposed article would have read, "All municipal corporations shall have the right to sue and shall be subject to be sued in all courts in like manner as natural persons." After objections were raised, this section was tabled. Id., pp. 3689-95.
On the following day, further debates were held on the proposed section. We reproduce a significant portion of those debates, because they materially affect the question before us:
"Mr. BooneThe committee authorizes me to offer this substitute for Section 1 of the report which was tabled yesterday, and I offer it.
"The substitute read as follows:
"Substitute for Section 1 of the Article on Municipal Corporations so that Section 1 will read as follows:
"Municipal Corporations shall have the right to sue and shall be subject to suit in the courts of this State.

*1352 "Mr. BooneThe committee
"Mr. DentI rise to a point of inquiry.
As I understand it, the Convention tabled Section 1. I do not see how you can very well offer a substitute for a section that is on the table.
"The PresidentIt could not be done. The only proper parliamentary motion would be to take Section 1 from the table, with the notice that the gentleman proposes to offer as a substitute this section, if the Convention takes it from the table.
"Mr. BooneThen I make the motion to take Section 1 from the table, and will offer this substitute for it.
"A reading of the substitute was called for and the substitute read.
"The PresidentNow the motion of the gentleman from Mobile is to take from the table Section 1, and he gives notice that if the Convention takes it from the table, he will offer as a substitute the section which has just been read, and which is recommended by the committee.
"Upon a vote being taken, a division was called for, and by a vote of 46 ayes and 25 noes, the motion to take Section 1 from the table prevailed.
"Mr. BooneMr. President, the substitute of the Committee is introduced for the simple purpose of making it plain in the fundamental law of this State that a municipal corporation can be sued and shall be subject to suit, and why do we think that that is material? Because if you will turn to the Declaration of Rights, you will find a provision in there that the State of Alabama shall never [be] made a defendant in any suit at law or in equity. We think this is material to put in the Constitution because the converse of this proposition appears in the declaration of rights in reference to the State, which may be said to be the parens patriae of these, its children, the municipal corporations of the State; they are all subject to the State; the State brought them into being, and the State can abolish them. Now, we think that this does not create any new cause of action. It was in the Constitution before that all corporations should be sued and should be subject to suit in all the courts of this State, and we just simply say that municipal corporations shall have the right to sue, and shall be subject to suits in the courts of this State.
"Mr. O'Neal (Lauderdale)That does not apply to municipal corporations.
"Mr. BooneBut sir
"Mr. HoodHaven't the courts of this State held that the word `corporation,' as used in the present Constitution, had not reference to municipal corporation?
"Yes, sir; and that is the very reason, gentlemen of the Convention, that we want to put it in the Constitution, that Municipal corporations can be sued.
". . . .
"Mr. HoodWe have nothing in the present Constitution authorizing suits against municipal corporations, have we?
"Mr. BooneNot expressly, and that is why we want it in there. We don't want it to put [sic] in the power of the General Assembly to say that no municipal corporation shall be sued, because we think that in carrying out the governmental functions, if they trespass upon the rights of a citizen, or wrong a citizen, they should be liable to suit.

"Mr. Walker (Madison)Would not a provision of this kind raise the very serious question as to the power of the Legislature to limit the right of bringing any kind of suit by garnishment or otherwise against a municipal corporation, and isn't it dangerous on that account?
"Mr. BooneI would ask the gentleman if he thinks it dangerous for the Legislature to provide that a suit shall not be brought against a county unless it shall have been first filed with the Board of County Commissioners. There are other sections which authorize the bringing of a suit against a county.
"Mr. WalkerMy answer to that is, under the present law, regulations of that sort are left to the Legislature. I do not want to put in the Constitution, that such regulation will not be left to the Legislature.

". . . .

*1353 "Mr. Hood ... Mr. President, it certainly does leave the question in doubt as to whether the Legislature could regulate suits against cities, should this provision be placed in the Constitution....
"Mr. BooneMay I ask a question? Could the Legislature take away the right to sue and be sued now?

"Mr. HoodNot if this provision is placed in the Constitution.

"Mr. BooneBut if we do not put it in there?

"Mr. HoodProbably it could ....
"Mr. ColemanMr. President and delegates of the Convention, this is an untried innovation upon existing law, and to my mind, it is attended with very serious consequences. The question propounded by the member of the committee demonstrates itself the danger to be encountered by the adoption of this section. He asks the question, could not the Legislature pass a law prohibiting suits against a city, were it not for this section that he proposes to introduce in the organic law. Now if this section prohibits the Legislature from passing a law which will prevent suits being instituted against cities, where is the line to be drawn, where the Legislature can prescribe what suits shall be brought and what shall not be brought. The very proposition and the very question of the gentleman who represents the committee demonstrates on its face the danger of putting in the organic law such a provision as this. Under existing laws, cities may be sued in all proper cases regulated by statute.
". . . .
"Mr. WhiteI heartily approve of the section proposed by the Committee, and I have heard no good reason advanced why that section should not be adopted. Under the law of Alabama today, towns and cities may sue and be sued. Well under that law, giving them the right to sue and be sued, you cannot take from them the revenues necessary to carry on the municipal government. In other words, placing this in the organic laws does not give any other rights than those which are now possessed either by the city or those having claims against the city, the only difference is that it makes it permanent.

"Mr. ColemanDon't you know that where a city may be sued, is provided by statute?
"Mr. WhiteNo, I don't know anything of the kind.
"Mr. ColemanI would like to know then, where you get the power?
"Mr. WhiteBy law.
"Mr. ColemanWhat law?
"Mr. WhiteThe law of the State.
"Mr. ColemanIsn't that statutory law?
"Mr. WhiteOf course, I had not understood you. The right to sue and be sued is given not by the Constitution, but by statute. If it is right by statute, why is it not right by the Constitution?
"Mr. ColemanWill you permit another question?
"Mr. WhiteI have not the time, but never mind, I will answer you.
"Mr. ColemanDoes the statute provide for the instances in which a city may be sued?
"Mr. WhiteNo, it says may sue and be sued, and leaves it to the common law to say wherein they are liable. That is, the law of the land. They simply may be sued in cases where there is a cause of action and this does not create any cause of action, [it] simply gives a right to sue in cases where there is a cause of action, and it takes away from the Legislature the right to deprive a citizen of the right to bring suit against a city where he has a cause of action. We are just entering upon an era when they own the water works, lighting plants, sewers, and a vast amount of other things. In other words, they are taking the place of other corporations and individuals in supplying the public with public utilities.... [I]t is proper and right that in the organic law of the State, we shall implant a principle which cannot be destroyed by legislative action, that whenever a cause of action exists against a city, that the citizen shall have the right to maintain a suit thereon .... I say it ought to be written in the organic law of Alabama, and written there to stay, *1354 and I hope the section will be adopted. I regard it as the most important section that has been reported by that committee and I now move the previous question upon it.

"President Pro TemThe gentleman from Jefferson moves the question upon the substitute, as I understand now before the House. The question is shall the main question be now put?
"The main question was ordered.
"The President Pro TemThe question is upon the adoption of the substitute.
"Upon a vote being taken, a division was called for, and a further vote being taken, there were 40 ayes and 43 noes, and the substitute was lost.
". . . .
"Mr. ColemanThat brought Section 1 before the Convention, and the substitute was defeated, and that leaves Section 1 before the Convention.
"President Pro TemThe gentleman is right.
"Mr. ColemanI move to lay Section 1 on the table.
"Upon a vote being taken the motion to table prevailed."
Official Proceedings, supra, vol. III, pp. 3755-62 (emphasis added). Section 1 was not again taken from the table and its provisions were not adopted into the Constitution.
It was clearly the delegates' understanding that, absent the incorporation into the Constitution of the proposed section, the Legislature would have power to regulate actions against municipalities. The delegates obviously viewed actions against municipal corporations as being different from actions against private corporations or individuals. This view is sustained by a reading of the cases on the subject, both before and after the Convention. Because the constitutional framers deliberately and specifically declined to add any constitutional preservation of the then-existing limited statutory provision for actions against municipalities, such actions were (and are) subject to legislative control.
This conclusion is supported not only as a matter of constitutional history but also as a matter of policy. Having considered § 11-93-2 in the context of a § 11 challenge, we conclude that the principles discussed in Anders correspond to the views of the delegates to the 1901 Constitutional Convention and that those principles apply to an analysis under § 11.
Similar arguments hold true for actions against counties; in fact, actions against counties have been even more sparingly allowed than actions against cities, and have been even more rigorously controlled by the legislature. Indeed, it was long held that unless the legislature specifically granted a right of action against a county, no such action would lie. See Hudson v. Coffee County, 294 Ala. 713, 321 So.2d 191 (1975).
Thus, the liability of cities and counties has been imposed, if at all, only with due regard for the competing needs of conserving public funds and of compensating injured parties and with deference to the legislature in regulating and balancing these matters. In Jackson v. City of Florence, 294 Ala. 592, 320 So.2d 68 (1975), the Court held that the governmental/proprietary function test would no longer be used in determining whether an action would lie under Alabama Code 1975, §§ 11-47-190 through -192. In Lorence v. Hospital Board of Morgan County, 294 Ala. 614, 320 So.2d 631 (1975), the Court held that the rationale of Jackson applied to counties. In so changing the doctrines of municipal and county liability, however, the Court acknowledged the legislature's power to pass laws regulating municipal and county liability:
"[W]e recognize the authority of the legislature to enter the entire field, and further recognize its superior position to provide with proper legislation any limitations or protections it deems necessary in addition to those already provided in [§§ 11-47-23, -191, and -192, Ala.Code 1975]."
Jackson, 294 Ala. at 600, 320 So.2d at 75 (emphasis added).
In light of the foregoing discussion, we hold that § 11-93-2 does not violate the right to jury trial guaranteed by § 11 of the Constitution. If a plaintiff's cause of action carries a right to jury trial, a jury may be demanded in an action against a city or county. Because cities and counties are exercising *1355 governmental functions, however, and because judgments against them must be paid out of public moneys derived from taxation, the reasonable limitation of § 11-93-2 on awards against them must be sustained. If the Constitutional Convention had adopted the proposed limitation on the legislative power to regulate actions against municipalities, we would probably reach a different result. Given this constitutional history, however, we cannot say that § 11-93-2 violates the constitution.
For the foregoing reasons, we affirm the judgment awarding Garner $100,000 from the City of Opp. As stated earlier in the opinion, we hold against the appellant Garner on the issues concerning the duty of Covington County to maintain the intersection, and we affirm the judgment on the verdict in favor of Covington County. We also reject, for the reasons stated above, the arguments by the City of Opp on the issues raised in its appeals.
1911100AFFIRMED.
1911105AFFIRMED.
1911150AFFIRMED.
1911151AFFIRMED.
SHORES, ADAMS, KENNEDY and INGRAM, JJ., concur.
MADDOX, J., concurs specially.
HOUSTON and STEAGALL, JJ., concur in the result.
MADDOX, Justice (concurring specially).
In Jackson v. City of Florence, 294 Ala. 592, 320 So.2d 68 (1975), when a majority of this Court abolished municipal immunity, the majority said:
"In deciding, as we do, that municipal immunity for tort is abolished in this state after the date of this opinion, we recognize the authority of the legislature to enter the entire field, and further recognize its superior position to provide with proper legislation any limitations or protections it deems necessary in addition to those already provided in Title 37, §§ 503 and 504, and in Title 37, § 476, Code [of 1940]."
294 Ala. at 600, 320 So.2d at 75.[9] (Emphasis supplied.)
The act being challenged was adopted by the Legislature after the opinion in Jackson was released. In view of that strong statement about legislative power, there should be no question about the Legislature's power to put a cap on damages in actions against municipalities. Consequently, I concur with the portion of the majority opinion upholding the constitutionality of the statute that puts a cap on damages in actions against municipalities, and I write specially only to address statements in the opinion that seem to suggest that legislative power to limit the recovery of damages, whether compensatory or punitive, might be limited to actions against governmental entities,[10] and to state again, as I have on other occasions,[11] what I believe is the role of this Court when faced with a constitutional challenge to a legislative enactment.
The majority's statements about the difference between governmental entities and individuals or private corporations seem to suggest that the Legislature, because of the provisions of §§ 11 and 13 of the Constitution, might be prohibited from regulating the recovery of damages in civil actions against individuals and private corporations. I clearly do not believe that either § 11 or § 13 prohibits legislative action, if there is a valid *1356 legislative purpose to support the legislation, of course. For example, in Gentry v. Swann Chemical Co., 234 Ala. 313, 174 So. 530 (1937), an employer challenged the original worker's compensation law on the ground that the legislature could not require an employer to pay damages for an injury without proving fault on the employer's part. This Court, finding a sufficient quid pro quo for the exercise of legislative power, upheld the legislative alteration of the common law. In Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939), this Court held that the Legislature could adopt the so-called "guest statute" and by it immunize certain persons from a lawsuit. In Reed v. Brunson, 527 So.2d 102 (Ala.1988), this Court upheld a legislative act that immunized co-employees from suit in certain factual settings. I realize, of course, that during the past 20 years more and more challenges have been made to legislative power on the ground that legislative enactments violate either § 11 or § 13 of the Alabama Constitution, and this Court, unfortunately, has found that such violations have occurred. I believe that those cases failing to recognize legislative power were incorrectly decided, and I have spelled out my reasons in dissenting opinions. See footnote 3.
The result reached in this case is consistent with that strong statement of legislative power in Jackson v. City of Florence, where this Court specifically "recognize[d] the authority of the legislature to enter the entire field [of municipal tort immunity], and further recognize[d] [the Legislature's] superior position to provide with proper legislation any limitations or protections it deems necessary in addition to those already provided [by law]"; consequently, I agree with the result, but because the opinion contains statements that seem to suggest that when this Court is faced with a similar challenge in a case involving a nongovernmental defendant, the result will probably be different, I wanted to state why I think the Legislature's power to enact the statute at issue here does not rest upon such a slender reed as who the defendant might be, but rests upon a much more substantial and lasting basethe plenary power of the Legislature.
HOUSTON, Justice (concurring in the result).
I have a problem with the following sentence in the majority opinion: "If the Constitutional Convention had adopted the proposed limitation on the legislative power to regulate actions against municipalities, we would probably reach a different result." Opinion at 1355. Because I consider this sentence dictum, I have not sufficiently researched this; and, therefore, I am not comfortable in saying at this time that we "would probably reach a different result." I concur with the rest of the majority opinion.
NOTES
[1] This Court held in Yates v. Town of Vincent, 611 So.2d 1040 (Ala.1992), that a city and a county cannot concurrently exercise control over the same roadway. The parties here have not argued this case on this basis, so we address the case as it is presented by the parties. Under Yates, however, the instruction that Opp had a duty to maintain the intersection was obviously correct, because Maloy Street and the Old Perry Store Road were clearly under Opp's control. Moreover, under Yates, the submission to the jury of the issue of whether Covington County had a duty would at most be harmless error, because Yates would support a directed verdict for the county and because the jury returned a verdict for the county.
[2] At least one other case, Alabama Power Co. v. Dunaway, 502 So.2d 726 (Ala.1987), has held that the duty question is solely a question of law for the trial court.
[3] We note that the language in 57 Am.Jur.2d Negligence § 34, which was relied on by Justice Jones in Sungas, has been somewhat diluted in the latest version of the treatise. Although 57A Am.Jur.2d Negligence § 86 (1989)which is very similar to § 34 of the 1971 versionstates that some jurisdictions hold that the duty issue is for the court, the language is no longer cast in the absolute; the words "never ... for the jury" do not appear in the new section.
[4] These two cases were distinguished or limited in Yates, supra, n. 1.
[5] Garner also argues that the trial court's failure to give the jury an affirmative charge concerning Covington County's duty, based on Instruction 27.01, A.P.J.I., was error. This argument is meritless: the facts upon which the existence of Covington County's duty depended were disputed; therefore, a charge placing a duty upon Covington County as a matter of law would have not been proper.
[6] The term "governmental entity" includes municipalities and counties. Ala.Code 1975, § 11-93-1.
[7] Moore held unconstitutional under § 11 a cap on "noneconomic" damages in medical malpractice actions.
[8] The proposed sections that were adopted by the Convention became a division of Article XII, "Corporations," rather than a separate article.
[9] The opinion in Jackson was written by Justice Shores, with whom Justices Faulkner, Jones, Almon, and Embry, concurred; Chief Justice Heflin dissented, without opinion; Justice Merrill dissented, with an opinion in which Justice Maddox concurred.
[10] The majority states that the result reached is based, at least in part, upon "the unique status of counties and cities as governmental entities," and upon the fact that "[t]he delegates [to the 1901 Constitutional Convention] viewed actions against municipal corporations as being different from actions against private corporations or individuals." Opinion at 1354. (Emphasis added.)
[11] See, Moore v. Mobile Infirmary Ass'n, 592 So.2d 156 (Ala.1991) (Maddox, J., dissenting); Fireman's Fund American Insurance Co. v. Coleman, 394 So.2d 334 (Ala.1980) (Beatty, J., dissenting, and joined by Maddox, J.); and Grantham v. Denke, 359 So.2d 785 (Ala.1978) (Maddox, J., dissenting).