COOK, Justice.
Larry Herman Lee, as administrator of the estate of his deceased son, Larry Richard Lee, appeals from a summary judgment entered in favor of the defendant City of Anni-ston in Lee’s action against the City alleging negligence in regard to the death of his son. We reverse and remand.
According to unrefuted evidence, the events culminating in this action began in the early 1960s with the City’s construction of a storm-sewer drainage system along, and parallel with, Weaver Road in the City of Anni-ston. At that time, there was a square, storm-sewer drainage pipe running down each side of Alabama State Highway 21, which joins or intersects Weaver Road. The dimensions of each pipe were four feet by four feet.
At the point of intersection of the two roadways, the State of Alabama extended one of the pipes across and underneath Highway 21 to bring the outlet into close proximity with the outlet of the pipe on the other side. At the outlet points, the State performed some construction work, in order, apparently, to incorporate the two outlets into a single outflow unit. The drainage from that unit flowed down Weaver Road through an open ditch, pouring into Cane Creek approximately one mile distant.
During that period of time, the City annexed the “Lenlock area.” C.R. 2S2(C). “The City, as part of an annexation agreement with the Lenlock area ... agreed to close the ditch through Lenlock.” Id. Closing the ditch, however, required the City to provide an alternative method of draining the storm sewage down Weaver Road to Cane Creek.
The City decided to resolve this problem by laying a 54” corrugated metal pipe in the ditch line and covering it up. It installed the intake end of its pipe on the State’s right-of-way, at the face of the State’s outflow unit. This installation apparently required some further modification of the existing outflow unit, for the City built a concrete “headwall” around the intake end of its pipe. When the installation was completed in the early 1960s, there existed an “inlet pit,” approximately four feet deep, into which poured the outflow from the State’s two 4x4-foot pipes. All the water that poured into the inlet pit was thus forced to drain through the one 54” pipe installed by the City down Weaver Road to Cane Creek.
No grates, guards, barricades, or warning signs were placed over or around the pit. These modifications were “field engineered,” that is, the City commissioned no studies and conducted no tests to determine the environmental effects of these installations. C.R. at 144. During the ensuing years, the area around the inlet pit experienced considerable development, which, in turn, affected the system’s ability to drain the area; however, from the time the inlet pit was constructed and the pipeline was installed up until the *757 time of this action, the City conducted no maintenance of that system.
On September 5, 1992, the City experienced an unusually heavy rainstorm. Caught in that storm, while riding bicycles, were 14-year-old Larry Richard Lee; 14-year-old Michael Lee; and Bobby King. The boys took shelter inside a Wal-Mart store until the rain subsided, and then they continued riding.
As they approached the inlet pit, an area with which they were unfamiliar, the inlet pit appeared to be a “mud puddle” because water had filled and overflowed it entirely. Mistaking the inlet pit for a mud puddle, Michael, who was in the lead, rode his bicycle directly into it. Bobby King quickly pulled Michael, who was standing in water up to his neck, from the pit.
Immediately, they discovered Larry’s bicycle lying at the edge of the pit, but Larry had disappeared. Neither Michael nor Bobby actually saw Larry go into the water. C.R. at 316-18.[1] Rescue workers arrived and searched the submerged pit, but to no avail. Larry’s body was eventually discovered in Cane Creek, into which it had been swept by the water from the inlet pit through the mile-long pipeline.
Larry’s father sued the City, alleging that it had “negligently ... designed] and constructed] the ... storm sewer system such that it was abnormally dangerous, and was without adequate safety devices which the ... [City] knew or should have known would be required for the safety of individuals upon the premises.” The City moved for a summary judgment, and the trial court granted the motion. The plaintiff appealed. The resolution of this case turns primarily on the duty owed Lee’s son and other members of the public by the City under these facts.
Pursuant to AIa.Code 1975, §§ 11-50-50 to -56, “municipalities are authorized to construct and maintain drainage systems.” City of Mobile v. Jackson, 474 So.2d 644, 649 (Ala.1985).[2] Although “a municipality is not required to exercise this authority, once it does so, a duty of care arises and a municipality may be liable for damages caused by its negligence.” Id. The action of a municipality in constructing a drainage system is, therefore, attended by a duty to exercise due care to “avoid injury to persons and property.” Sisco v. City of Huntsville, 220 Ala. 59, 60, 124 So. 95, 95 (1929). “While related to the government function of preserving the public health, such improvement and the maintenance thereof involves continuous management” Id. (emphasis added). See *758 Whitworth v. Utilities Bd. of the Town of Blountsville, 382 So.2d 557, 560 (Ala.1980); Brown v. City of Fairhope, 265 Ala. 596, 600, 93 So.2d 419, 422 (1957).
According to the unrefuted testimony of two City employees, Charles Johnson and Thurman Kelly, the City itself constructed or installed the storm-sewer system from the inlet pit to Cane Creek, including the pertinent construction or modification of the pit. The City, however, seeks to avoid the application of the above-stated rule on the ground that the inlet pit itself was constructed on and “located wholly within the State of Alabama’s right-of-way adjacent to Highway 21.” Brief of Appellee, at 6. It argues that it “has had no right of control over the [inlet pit] since [its] construction, so there has been no duty owed by the City since that time.” Id. at 6-7 (emphasis added). We are unpersuaded by this argument.
The duty of a municipality to exercise due care in the construction and maintenance of its drainage systems “is analogous to that involved in the construction and maintenance of streets.” Sisco v. City of Huntsville, 220 Ala. 59, 60, 124 So. 95, 95 (1929). “The test for determining whether a county or a municipality has a duty to maintain a roadway is whether it has a right to control, or to participate in the control, of the roadway.” Garner v. Covington County, 624 So.2d 1346, 1350 (Ala.1993) (emphasis added). See also Makarry v. City of Gadsden, 587 So.2d 966, 968 n. 1 (Ala.1991) (right to control, with consequent duty to exercise due care, may be shared by a municipality and the State). We cannot conclude that the City has no right to control—or duty to maintain—that portion of the inlet pit, namely, the 54” intake pipe and the headwall the City installed and built, in the absence of evidence that the State had expressly assumed the exclusive right of control and duty of maintenance.
The fact that the City’s intake pipe is on the State’s right-of-way is not dispositive. After all, the City placed it there. The City presented no evidence that it had sought, or thought it had needed, permission from the State to construct its portion of the inlet pit or to place the intake pipe in it initially. Indeed, of the entire “Lenlock” sewer system, running from the inlet pit down Weaver Road to Cane Creek, it is only the maintenance of that few feet in close proximity to Highway 21 for which the City does not acknowledge responsibility.
To be sure, the State does have an interest in traffic control on its highways. However, no evidence suggests that the State has any interest in the sewer system running down Weaver Road, which is not a state roadway; that is, no evidence suggests that the State has any interest in the sewer system or the storm-water drainage after it leaves the State’s two 4x4 foot pipes. We wonder if the inlet pit, and, consequently, the City’s intake pipe, had become clogged with debris, would the City have refused to remove the debris, insisting that such maintenance was the sole responsibility of the State?
Logically, that portion of the sewer system posing the most danger to the public, thus requiring the greatest degree of care and diligence in construction and maintenance, was the intake pipe. The argument of the City invites us to conclude that the City could construct a mile-long sewer system connected to a large, unprotected intake pipe and subsequently disavow all responsibility for personal injuries resulting from negligent construction of the pipe, on the ground that it lay on a few feet of the State’s right-of-way. Such a conclusion is illogical and unwarranted under these unrefuted facts. Therefore, we conclude that the City, having undertaken to construct this sewer system, did—at a minimum—share with the State the duty to use due care in constructing and maintaining the portion it built on the State’s right-of-way.
Moreover, the plaintiff presented substantial evidence indicating that the City breached that duty. The plaintiffs expert witness, William W. Moss, testified in pertinent part:
“3. The survey of the aforementioned site showed a junction of a double four foot by four foot concrete culvert and a fifty-four inch corrugated metal pipe drainage system located west of Alabama Highway 21 and northeast of the Hardee’s location in Anniston, Alabama.
*759 “4. The existing double four foot concrete culvert with a slope of 1,14% was constructed across Alabama Highway 21 at some unknown date. The cross sectional area of this drainage structure is thirty-two square feet. The uniform, capacity of a structure of this size, length and slope is U7S-19 cubic feet per second. There was approximately 126.1 acres of drainage leading to this structure.
“5. The existing fifty-four inch corrugated metal pipe with a drainage slope of 1.8% was placed by the City of Anniston, Alabama after the construction of the double four by four concrete culvert. The cross sectional area of this drainage structure is 15.88 square feet. The uniform capacity of a structure of this size, length and slope [is] 268.81 cubic feet per second. There is, in addition to the flow of the four foot by four foot concrete culvert, approximately 15.6 additional acres of drainage leading to this structure via an open culvert which runs along the western edge of Highway 21.
“6. In my opinion, the capacity of the fifty-four inch corrugated metal pipe is not adequate to accommodate a major storm event. During these storm events the water would be forced to back up between the four foot by four foot culvert and the fifty-four inch corrugated metal pipe. When the storm event subsided the water would then drain[,] creating extreme turbulence and vortexes [and] causing a very dangerous situation.
“7. In my opinion, the party or parties who subsequently installed the fifty-four inch corrugated metal pipe drainage system were negligent in that the fifty-four inch corrugated metal pipe drainage system was inadequate to remove the water draining from the pre-existing double four foot by four foot concrete culvert and the open drainage culvert previously existing. Because the fifty-four inch corrugated metal pipe system was inadequate it was foreseeable that a dangerous situation would occur during a major storm event.”
(Emphasis added.)
The City contends that this testimony is deficient in that it does not, the City says, speak to the environmental factors that existed in the 1960s, that is, when the intake pipe was installed. The City argues that it had no duty to maintain the pipeline, and, therefore, that the crucial inquiry must focus on the factors that existed at the time of construction. For a number of reasons, we are unpersuaded by these arguments.
First, the expert testimony does address factors that were known, or that should have been known, to those who initially installed the pipeline. Specifically, it points out that the inlet pit was fed by two If x If pipes, with a combined flow capacity of “lf.7S.19 cubic feet per second,” but was drained by only one 5&” pipe, with a flow capacity of “263.81 cubic feet per second.” (Emphasis added.) This testimony indicates that when the City installed its 54” pipe, the pit’s inflow capacity nearly doubled the outflow capacity. This conclusion follows, without regard to how subsequent development might have affected the rate of inflow.
Second, City employee Thurman Kelly testified that the City’s initial intention was to use an intake pipe that was the same size as each pipe that fed into the pit. Only ordinary observation and the application of general principles of logic are necessary to deduce that one pipe cannot accommodate the same volume of flow as two pipes, where all three pipes are approximately the same size.[3] Thus, it would have been known to the casual observer or construction engineer, at the time of construction, that the system’s design would allow the volume of water entering the pit to double the volume that could exit — thus allowing water to fill and overflow the pit until the outflow began to exceed the inflow. Accordingly, it could also be deduced that during the standing-water stage, the inlet pit would assume all the visible characteristics of an ordinary mud puddle. Not only so, but this construction would be ex *760 pected to create at the bottom of the pit a powerful and dangerous — but invisible — undercurrent.
Third, in contradiction to the City’s argument that before the accident it had no notice of the dangers inherent in such a construction, the following deposition colloquy took place, involving City employee Charles Johnson:
“Q. Are you aware of any other incidents or accidents that have occurred at or around that site?
“A. [By Charles Johnson] Not at or around that site.
“Q. How about any other sites within the City of Anniston that are similar?
“A. I heard a story that during a heavy rain, some time ago, an Anniston Star reporter posed a young lady in a channel to show the depth of the water, and she lost her footing and went through a pipe because she was backed out into the main part of the stream by the photographer.”
C.R. 237 (emphasis added). Regardless of the veracity of the story involving the Anni-ston Star reporter, it is evident that the City was on “inquiry notice” that unguarded, unmarked, sites “similar” to the one involved in this ease could pose serious dangers to the public.
In summary, we conclude that the City owed a duty of due care in constructing and maintaining its portion of the inlet pit, which — at a minimum — the City shared with the State. We also conclude that the plaintiff presented substantial evidence indicating that that duty was breached in this ease and that the breach resulted in the death of the' plaintiff’s son. The trial court erred in entering the summary judgment in favor of the City; that judgment is reversed and the cause is remanded for further proceedings.
REVERSED AND REMANDED.
ALMON, SHORES, KENNEDY, and LYONS, JJ., concur.
HOUSTON, J., concurs in the result.
HOOPER, C.J., and MADDOX and SEE, JJ., dissent.

. This account of the accident just recited is taken from the deposition testimony of Michael Lee. We note that it differs from the following "undisputed” facts set forth in the trial court’s judgment:
“1. On September 5, 1992, Lariy Lee and his cousin, Michael Lee, were riding their bicycles along Alabama State Highway 21 in Anni-ston, Alabama during a heavy rainstorm which resulted in flash flooding in a particular area of Anniston known as Lenlock.
"2. While riding in the rain, Lariy Lee and Michael Lee rode their bicycles through a storm sewer culvert.
"3. While riding through the culvert, Michael Lee fell from his bicycle and the bicycle remained in the water.
“4. Lariy Lee walked into the storm sewer inlet pit to recover his cousin’s bicycle and was swept into the pit and subsequently drowned.” We also note that Michael’s deposition was
first presented to the trial court in connection with the plaintiff's motion to “reconsider” the summary judgment. Although the testimony of Michael, who, other than Bobby King, was the only eyewitness to the accident, represents,' by far, the most authoritative and coherent explanation of the incident heretofore presented, we do not base our resolution of this case on the facts as presented in Michael’s testimony. This is because the trial court did not consider his deposition when it ruled on the City’s motion for a summary judgment. Moore v. Glover, 501 So.2d 1187 (Ala.1986). Our resolution of this case is based on the "facts” as set forth in the judgment. In other words, our decision does not turn on a choice of factual scenarios.

. For example, § 11-50-50 provides:
"All cities and towns may make all needful provisions for the drainage of such city or town, may construct and maintain efficient sanitaiy and stormwater sewers or sewer systems, either within or without the corporate limits of the city or town, may construct and maintain ditches, surface drains, aqueducts and canals and may build and construct underground sewers through private or public property, either within or without the corporate limits of such city or town, but just compensation must first be made for the private property taken, injured or destroyed.”

. The area of each 4’x 4' pipe is 16 square feet [A = Iw; = 4’ X 4’; =16 square feet]. The area of the 54” intake pipe is approximately 15.89 square feet [A = (ir)r2; = (3.14) 27" 2; = (3.14) 729; = 2289.06 square inches; = 15.89 square feet (2289.06 + 144)].