Rel: June 26, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

_____

### SC-2025-0293
_____

### The City of Mountain Brook

v.

### Rodney E. Miller and Mary Leah Miller

### Appeal from Jefferson Circuit Court
### (CV-24-901073)

PER CURIAM.

On May 15, 2023, the home and property owned by the plaintiffs, Rodney E. Miller and Mary Leah Miller, in Mountain Brook was flooded

with several feet of water, causing over $80,000 in damages. This was only two weeks after they had purchased the property. According to the Millers, the flooding occurred after stormwater overflowed through the drain inlets in the City's drainpipes and released water onto their property.

In March 2024, the Millers sued the City of Mountain Brook ("the City") in the Jefferson Circuit Court. In their amended complaint filed one month later, the Millers alleged claims of negligent maintenance, trespass, and nuisance. Their allegations were based on the theory that, despite being made aware of the flooding issues on their property and in other areas and despite being made aware that its drainage system was no longer adequate to handle the amount of stormwater that was being drained through it, the City chose not to upgrade the drainage system. This, they alleged, was a breach of the City's duty under Alabama law. They thus sought injunctive relief and damages.

Following discovery, the Millers filed a motion for a partial summary judgment, making these same arguments. In its response in opposition to the Millers' motion, the City argued, among other things, that it did not owe an individual duty to the Millers to upgrade its

stormwater-drainage system because such services are public services and any action taken related to that system necessarily implicates a duty owed to the public at large. It also argued that Alabama law makes clear that a municipality only owes a duty to an individual property owner not to negligently design, construct, or maintain its stormwater-drainage system so that it does not cause damage to that person's property. Because the Millers failed to produce substantial evidence that there were any maintenance issues with the City's drainpipes and drain inlets, such as blockages, the City argued that the Millers were not entitled to an offensive summary judgment in their favor and that it was, instead, entitled to a summary judgment in its favor.

Following a hearing, the trial court granted the Millers' summary-judgment motion. It also awarded them $80,441.15 in damages and granted the Millers' request to permanently enjoin the City from further flooding their property. It denied the City's motion for a summary judgment.

The City now appeals. While our caselaw holds that Alabama law authorizes a municipality to build a stormwater-drainage system, it also recognizes that a municipality is not required to do so. If a municipality

3

decides to take such action, it then owes a duty to individual landowners not to design, construct, or maintain that system in a negligent manner.

In our view, a municipality's decision whether to <u>upgrade</u> its stormwater-drainage system is due to be treated in the same manner as its decision to build that system in the first place. Both decisions impact the community, not just a single resident. Both decisions also involve resolving competing wishes of different groups of constituents and balancing large budget priorities. In short, both are questions for an elected political body. The facts of this case amply demonstrate each of these circumstances.

For the reasons stated below, we hold that the City did not owe an individual duty to the Millers to upgrade its stormwater-drainage system. We therefore reverse the trial court's summary judgment in favor of the Millers and remand the case for that court to enter a summary judgment in the City's favor on that basis.

<u>Facts and Procedural History</u>

The record indicates that the City's drainpipes have been in place since at least 1928. Those pipes are part of a larger network of the City's stormwater-drainage infrastructure in the area of Canterbury Road,

4

Montevallo Road, Surrey Road, and Overhill Road located near Mountain Brook Village. The Millers' property is located on Montevallo Road.

The City's drainpipes and drain inlets at issue here are part of a 12-foot-wide stormwater-drainage easement (highlighted below) that runs along the rear lot lines of the Millers' neighbors' properties (Lots 266, 267, 268, and 269) and the rear lot line of the Millers' property (Lot 265).[1]



---

[1]We note that the record does not contain an actual deed for the easement; however, the parties do not dispute that the City had a dedicated "storm drain" easement here, and the record contains a copy of the subdivision plat for Mountain Brook Estates, which appears to constitute the deeding of the easement to the City.



(Zoomed in.) Although there is no direct evidence of who placed the pipes in the easement and no direct evidence of who owns the pipes in the easement, both sides treat them as being owned by the City.[2]

Those pipes are connected to a separate 36-inch reinforce-concrete pipe that traverses diagonally across the Millers' property (shown in yellow below).[3]



---

[2]The City was incorporated in 1942. We assume that the county owned the easements and the pipes before that and that they became the property of the City when it became incorporated. The parties do not argue otherwise.

[3]This image was presented to our Court by the Millers' counsel during oral argument on March 4, 2026, with no objection from the City.

This pipe has drain inlets that receive stormwater from surrounding properties and then channels that stormwater into the City's drainpipes.

### I. The Engineering Studies Conducted on the City's Stormwater-Drainage System Near and Around the Millers' Property

It is undisputed that Montevallo Road, Canterbury Road, Surrey Road, and Overhill Road have a long history of flooding. Over the years, the City has hired different engineering firms to study the flooding in those areas. Those studies revealed that the City's drainpipes and drain inlets have become "undersized" because of the development throughout the City over the years and, as a result, have a tendency to "surcharge" during heavy rain events.

According to the record, "surcharging" occurs when the capacity of a drainpipe is overloaded. Typically, the drain inlets capture the stormwater and direct the stormwater underground to the City's drainage system. However, when the drainpipes are overwhelmed, the reverse occurs and water surcharges out of the drain inlets onto surrounding properties, thus flooding those properties. This is what has allegedly been occurring at the Millers' property and their neighbors' properties.

In the 1950s, Schoel Engineering Company ("Schoel Engineering")

investigated the drainage issues in the area, including at the Millers' property. At that time, Schoel Engineering documented those issues as "problematic."

In the early 2000s, the City retained Hill Engineering to again study the drainage issues in the area ("the Hill Engineering study"). The Hill Engineering study led to a proposal to widen certain channels in the area and replace some pipes with culverts. However, the study was met with resistance from the City's residents who were located downstream from the Millers' property. Ultimately, the City chose not to implement the proposal from the Hill Engineering study.

In 2021 and 2022, the City retained Schoel Engineering to perform another hydrological study where "[c]ertain properties along Canterbury Road, Montevallo, Surrey and Overhill Road have historically flooded," including the Millers' property. In April 2022, Schoel Engineering presented its findings to the City in a preliminary report outlining a three-phase project to upgrade and enlarge stormwater infrastructure in this area. In that report, Schoel Engineering stated that the total estimated cost of all three phases of the project would be $3,944,000.

In an affidavit the City provided to the trial court, Walter Schoel,

8

the current senior principal at Schoel Engineering, gave his explanation of the findings contained in that report. According to Schoel, all three phases of the project had to be performed to mitigate (but not fix) flooding issues in the area. He explained that Schoel Engineering's "ultimate opinion which is conveyed to the City, is that the City should not undertake the drainage improvement project because the cost of the project outweighed the marginal benefit it provided." (Emphasis added.) He further explained that "it was determined that the implementation of the drainage improvement project would likely cause downstream impacts" and, as a result, that "the project would have to be extended downstream to mitigate the expected impacts, which would have significantly increased the overall cost of the project." (Emphasis added.)

With respect to the Millers' property specifically, Schoel noted that "the proposed drainage project would not reasonably mitigate flooding at the residence located at [the Millers' property]." (Emphasis added.) Schoel explained that, based on Schoel Engineering's studies and modeling, it was determined "that the project would not meaningfully improve conditions at [the Millers' property]," because the flooding experienced on the property was primarily due to the low elevation of the

9

finished basement relative to the adjacent stormwater infrastructure and topography.

According to the City, like the Hill Engineering study, the 2021-2022 School Engineering study was met with resistance from its citizens. One of the residents who opposed the earlier Hill Engineering study again voiced concerns about the downstream effects of the three-phase project, noting that "these problems have been going on for years" and that he had taken measures to prevent flooding on his own property which had been effective.

Numerous citizens objected to the three-phase project, stating that if additional water were added to stormwater infrastructure located near their downstream properties, as School Engineering's study projected, then "the damage will be extraordinary." Those citizens further claimed that the project would "harm many more residents than it will help" and that, "[i]f the plan goes forward and [they] are faced with the prospect of dealing with the inevitable damage that 14 additional inches of water will cause, [they] will have no choice but to utilize all available legal remedies." (Emphasis added.) See also C. 811-12 (resident email to the City's manager stating that "[s]everal of the residents downstream are

10

very concerned about the downstream impact of the project" and are "100% opposed" to it).

Additionally, like the Hill Engineering study, School Engineering's three-phase project would have required the City to obtain additional easements to perform/construct the project. According to Billy Pritchard, a member of the city council, at least one resident not only indicated that he would refuse to grant the City a construction easement for the project but also threatened legal action if the City moved forward with it. After considering all of these factors, the City decided not to move forward with the three-phase project.

II. Prior Flooding of the Millers' Property

It is undisputed that, since the 1950s, the Millers' property has experienced occasional flooding. It also appears undisputed that the frequency and severity of that flooding has increased over time. The first instance of flooding reflected in the record occurred in August 1957. Following that incident, the City's manager received a letter from School Engineering that discussed the "drainage problem" at the property and at an adjacent property located on Overhill Road.

In 2004, Steve Griffin, a prior owner of the Millers' property, hired

School Engineering's chief hydrologist David Hains to study the flooding issues on the property. During the course of his study, Hains observed at least one flooding event at the property, which occurred in September 2004. Hains later wrote a letter that set forth School Engineering's preliminary recommendations for mitigating flooding at the property. In an affidavit submitted to the trial court by the City, Hains explained that that letter

> "informed Mr. Griffin that he may be able to take flood proofing measures, such as by flood proofing the garage door openings, to reduce the severity of flooding in the house .... I also noted that there could possibly be additional measures taken by [the City] to mitigate flooding. However, at the time of this letter, Schoel [Engineering] had not performed an engineering analysis of the potential stormwater drainage improvements that the City may be able to perform in this area. Subsequent to this letter, Schoel [Engineering] studied the issue, and we determined that there were not any improvements the City could perform which would solve the flooding problems at [the property], and the engagement with Mr. Griffin ended."

(Emphasis added.) According to Hains, Griffin "never developed a plan or took any preventative measures to effectively flood proof the basement of [the property]."

In December 2020, Archie and Paige Andrews purchased the property. Over the next two years, the property flooded six more times,

12

allegedly causing hundreds of thousands of dollars' worth of damage to the Andrewses' home and their personal belongings.[4]

On May 5, 2023, the Andrewses sold the property to the Millers. Before that sale, the Millers received a home-inspection report that noted the following:

> "The driveway is equipped with several catch basins with underground drains that eventually drain into a sump pump …. Looks like this house has had plenty of drainage work. Check the operations of the drains and pump during a good soaking rain to make sure all works well. You don't want water to back up into the garage areas."

Elsewhere in the report, the inspector noted that the house "had some serious drainage work done" and that he "suspect[ed] maybe it flooded in the past." The inspector thus recommended that the Millers "[c]onsult

---

[4]On July 25, 2022, the Andrewses filed a sworn "notice of claim" with the City. Alabama law requires that a municipality be put on notice of tort claims against it "within six months from the accrual thereof or [those claims] shall be barred." § 11-47-23, Ala. Code 1975. In their "notice of claim," the Andrewses stated that the property had flooded six times since it was purchased in 2020, causing hundreds of thousands of dollars' worth of damage to the home and their personal belongings. Although the Andrewses stated in their notice of claim that they would bring claims of trespass, nuisance, negligence, and inverse condemnation against the City if the City did not pay them $300,000 and "remedy the flooding issues immediately," there is nothing in the record that indicates that they did so or that the City paid this claim.

[with] the current owner for more information" because they "may need flood insurance just for good measure." According to the Millers, despite asking direct questions regarding whether the property had ever flooded, the property's history of significant flooding was never disclosed to them.[5]

### III. The May 15, 2023, Rain Event

On May 15, 2023, 10 days after the Millers purchased the property from the Andrewses, it flooded. According to the Millers, their basement, garage, and driveway flooded, resulting in over $80,000 worth of damage to their property and personal belongings. They emphasized the force of the water rushing into the playroom in the basement and the harm that could have been caused to their children had they been in their playroom.

It is undisputed that flooding occurred not only on the Millers' property but in several other areas around the City. It is also undisputed that the flooding of the Millers' property was not caused by any blockage, clog, or obstruction of the City's drainpipe system or by a collapsed pipe in the system.[6] Rather, the flooding was caused by the City's stormwater

---

[5]The record does not indicate whether the Millers brought suit against the Andrewses as a result of this.

[6]This was confirmed by a video inspection of the City's drainage system after the flooding event.

14

drainpipes and drain inlets becoming overwhelmed with stormwater and surcharging.

The City contends that the rain event that caused the flooding was "exceptionally severe" and was beyond the designed capacity of the stormwater-drainage system near and around the Millers' property. The City also contends that the event would have been beyond the capability of any modern-day drainage system.

Following that flooding incident, the Andrewses assigned a flood-insurance policy to the Millers for the property. The Millers subsequently made a claim under that policy and received payment for their losses from the flooding event. Almost six months after the flooding occurred, on November 9, 2023, they submitted a "notice of claim" to the City concerning the flooding at the property and stating that they hoped they could continue to work with the City to resolve the issue.

IV. The Millers' Underlying Lawsuit Against the City

In March 2024, the Millers filed suit against the City. In their amended complaint filed one month later, the Millers alleged claims of negligent maintenance, trespass, and nuisance on the basis that the City's drainage "system" had "become" inadequate and that the City's

15

pipes are too small for the stormwater being directed to them.

In particular, the Millers alleged that, despite being made aware of the flooding issues on their property and in other areas, the City repeatedly failed to try to fix the drainage and flooding issues caused by its drainage system. Specifically, the Millers alleged:

> "73. In general, a municipality does not have a duty to maintain proper drainage of stormwater.
>
> "74. Ala. Code [1975,] § 11-50-50, however, authorizes municipalities, like [the City], to make necessary provisions for stormwater drainage and 'maintain efficient' stormwater drainage systems.
>
> "75. Once the authority is exercised by a municipality, a duty arises to maintain the drainage system in such a condition that the water cast into the drainage system does not cause it to overflow.
>
> "76. [The City] has exercised its authority and undertaken control of the stormwater drainage in [the Millers'] area.
>
> "77. [The City's] drainage system in [the Millers'] area is no longer adequate.
>
> "78. [The City's] drainage system has become overloaded, which has rendered its pipes too small for the services now required of them.
>
> "79. [The City] has allowed this condition to exist even after being notified of the problem.

16

"80. [The City's] pipes have <u>become</u> overburdened, rendering them undersized and resulting in stormwater backing up, overtopping of the drains near [the Millers'] property, and the flooding of [the Millers'] property.

"81. The flooding at [the Millers'] property and home originated from [the City's] drainage <u>system</u>.

"82. [The City] has breached its duty by failing to maintain its drainage <u>system</u>."

(Emphasis added.) The Millers further alleged that the City's failure to maintain its drainage system has not only interfered with their use and enjoyment of their property because of the flooding, but has also "invaded [their] property in such a manner as to affect [their] interest in the exclusive possession of their property." Accordingly, the Millers sought damages and an injunction to "abate[] the nuisance, protect [them] from [the City's] trespass, and prohibit[] [the City] from flooding [their] property."

On May 10, 2024, the City filed its answer to the Millers' amended complaint in which it denied the claims against it. The City also alleged various affirmative defenses.

<u>V. The Summary-Judgment Motions Filed by the Parties</u>

Following discovery, on November 20, 2024, the Millers filed a

motion for a partial summary judgment in which they argued that they were entitled to a judgment in their favor on their nuisance and trespass claims.[7] Relying on this Court's prior decision in City of Mountain Brook v. Beatty, 292 Ala. 398, 295 So. 2d 388 (1974), the Millers argued that the fact that the City's drainpipes and drain inlets at issue are maintained in an easement that the City possesses over properties located on Montevallo Road, Canterbury Road, Overhill Road, and Surrey Road, including their own property, does not give the City the right to flood that property outside of its easement. Specifically, the Millers argued that, like in Beatty, the City had a duty to maintain the drainpipes and drain inlets in its drainage easement so as not to cause an overflow of water onto their property. According to the Millers, despite having engineering firms telling it that replacing its undersized drainpipes and drain inlets with larger ones could help alleviate this

---

[7]According to the record before us, the Millers did not ask for a summary judgment on their negligent-maintenance claim. Their reason for not doing so, they said, was that "granting the [permanent] injunction and awarding the $80,441.15 in damages would nullify the need for a jury trial on [their] remaining claim, negligent maintenance, as the relief to be provided in the event of a recovery at trial on the negligent maintenance claim would be duplicative of the $80,441.15 being sought with this motion."

problem, the City declined to upgrade its drainage system, which led to a surcharging of water onto their property on May 15, 2023, thus breaching its duty not to cause them harm or injury. Because the City breached its duty, the Millers argued that, pursuant to this Court's decision in <u>Beatty</u>, they were entitled to a summary judgment on their trespass and nuisance claims along with a permanent injunction against the City prohibiting it from further flooding their property. They also requested $80,441.15 in damages.[8]

In its opposition to the Millers' motion, the City argued, among other things, that <u>Beatty</u> was distinguishable because the Millers' claims were based on the allegation that the City's drainage system had become inadequate over time and not on the City's failure to properly construct

---

[8]In support of their summary-judgment motion, the Millers attached several documents, including, among other things, (1) copies of plat maps showing where their property and the City's purported easement are located, (2) a copy of Schoel Engineering's 2022 report outlining the proposed three-phase project, (3) a copy of a preliminary plat design created by Schoel Engineering showing the extent of the changes that would need to be made to the area in and around the Millers' property to address the flooding issues, (4) some of the engineering studies that were done in the area surrounding the Millers' property, (5) depositions of city officials discussing the flooding issues in that area, and (6) a picture showing the flooding that occurred at their home.

or maintain its drainage system. Although the City acknowledged that our caselaw has recognized that a municipality owes a duty not to negligently design, construct, or maintain a stormwater-drainage system, it asserted that nothing in that caselaw exposes a municipality to liability to individual plaintiffs for failing to upgrade its drainage system. It insisted that any duty to upgrade would, at most, be owed to the public at large. Because the Millers had failed to make a prima facie showing that no genuine issue of material fact existed as to whether the design, construction, or maintenance of the portion of its drainage system was negligent in any way, the City argued that it did not owe them a duty to upgrade or expand its stormwater-drainage system on and in the area around their property. For these reasons the City argued that the Millers were not entitled to a summary judgment and that it was, instead, entitled to a summary judgment in its favor.[9]

---

[9]In support of its summary-judgment motion, the City attached a variety of exhibits, including (1) emails from the City's manager to homeowners, including the prior owners of the Millers' home, the Andrewses, in which he explained that even if the City upgraded its system their properties still would have experienced flooding; (2) images of the flooding that occurred on the Millers' property when it was owned by the Andrewses; (3) an affidavit from current city council-member, Virginia Smith, in which she explained that she has been on the city council since 2000 and that, during her tenure, the Millers' property "has

VI. The Trial Court's Order Entering a Summary Judgment and a Permanent Injunction in Favor of the Millers and Denying the City's Summary-Judgment Motion

After the Millers filed their response to the City's motion, a hearing was held on the parties' respective motions. Following that hearing, on April 4, 2025, the trial court entered a detailed order in which it granted the Millers' motion. It also awarded the Millers $80,441.15 in damages and a permanent injunction against the City.

In support of its decision to enter a summary judgment in favor of the Millers, the trial court found that the City possessed an easement that ran along the rear of the Millers' property through which the City drained its stormwater. Relying on Beatty, supra, the trial court held that the City had a duty to maintain its drainage easement so as not to cause an overflow of stormwater onto the Millers' property. Because it was undisputed that the stormwater at issue originated from the City's overwhelmed drainpipes and drain inlets within its easement and because the City knew about this issue for years but did nothing to fix it,

flooded during extremely heavy rain events"; and (4) an affidavit from David Hains, who had studied the flooding issues at the Millers' property in 2004, and determined that "there were not any improvements the City could perform which would solve the flooding problem at" their property.

the trial court concluded that it had breached its duty.

As to the Millers' request for a permanent injunction abating the nuisance and trespass created by the City's overwhelmed drainage system, the trial court found that the Millers had made a prima facie showing that no genuine issue of material fact existed as to whether the City breached the duty it owed to the Millers not to flood their property. Per Beatty, the trial court determined that the City should be permanently enjoined from further flooding their property in the future.

Although the Millers did not expressly move for a summary judgment in their favor on their negligent-maintenance claim, the trial court nevertheless addressed whether they were also entitled to a summary judgment on that claim. In doing so, the trial court found that, even if the present case did not involve the rights and duties of an easement holder like in Beatty, the Millers still would be entitled to an injunction abating the nuisance created by the flooding from the City's overwhelmed drainpipes and drain inlets because it was undisputed that the development permitted by the City "has adversely impacted [the City's] drainage system in the area near the [Millers'] property," "that [the City's] drainpipes at issue are no longer adequate," and that, despite

receiving "reasonable remediation plans from the engineering firm it retained, [the City] has failed to provide appropriate upkeep of its drainage system."

As to the City's assertion that it was entitled to a summary judgment in its favor because it did not owe a duty to the Millers to upgrade its stormwater-drainage system, the trial court explained that "Alabama law is clear that municipalities have the authority to construct and maintain stormwater sewers, surface drains, and ditches, and '[o]nce the authority to construct or maintain a drainage system is exercised, a duty of care exists, and a municipality may be liable for damages proximately caused by its negligence.'" (Quoting Kennedy v. City of Montgomery, 423 So. 2d 187, 188 (Ala. 1982) (internal citations omitted).) Because the conduct underlying the Millers' claim against the City had to do with the City's negligent failures to fix the issues with its drainage system, the trial court found, once again, that, per Beatty, supra, it did owe the Millers a duty to upgrade that system. It therefore denied the City's summary-judgment motion.

### VII. The Trial Court's Clarification that its Judgment is Final and the Present Appeal

On April 8, 2024, the parties filed a joint "Motion to Clarify" in

which they asked the trial court to clarify that its judgment was final despite being labeled a "partial" summary judgment in favor of the Millers. According to the parties, the trial court's judgment was in fact a complete resolution of all issues between them, including the Millers' negligent-maintenance claim, given that the trial court's judgment also addressed the Millers' negligent-maintenance claim. The trial court entered an order clarifying that its judgment was final and resolved all issues between the parties. The City then filed the present appeal with our Court.

Standard of Review

Our Court has recently stated that

"[t]his Court reviews a summary judgment <u>de novo</u>, and we use the same standard used by the trial court to determine whether the evidence presented to the trial court presents a genuine issue of material fact. <u>Nettles v. Pettway</u>, 306 So. 3d 873, 875 (Ala. 2020). 'On motion for summary judgment the burden is upon the movant to show that no genuine triable issue of material fact exists.' <u>Amason v. First State Bank of Lineville</u>, 369 So. 2d 547, 552 (Ala. 1979). … When cross-motions for a summary judgment are filed, 'the burden remains on each movant to establish the propriety of the court entering summary judgment on its own motion.' <u>Id.</u> 'The fact that the first party fails to carry the burden on [its] motion does not necessarily mean that the other party has carried the burden under [its] own motion and should be granted summary judgment.' <u>Id.</u> 'Where cross-motions for a summary judgment are filed in the trial court, the party whose motion

24

was not granted is entitled to have that motion reviewed on an appeal from the grant of the opponent's motion.' <u>Mountain Lakes Dist. v. Oak Grove Methodist Church</u>, 126 So. 3d 172, 180 (Ala. Civ. App. 2013)."

<u>790 Montclair, LLC v. Birmingham Metro, LLC</u>, [Ms. SC-2024-0810, July 3, 2025] ____ So. 3d ____, ____ (Ala. 2025). Additionally, the entry of a permanent injunction is reviewed de novo. <u>See</u> <u>Sycamore Mgmt. Grp., LLC v. Coosa Cable Co.</u>, 42 So. 3d 90, 93 (Ala. 2010).

<u>Discussion</u>

On appeal, the City argues that the trial court erred in entering a summary judgment in favor of the Millers on their tort claims and in entering a permanent injunction against it. According to the City, no genuine issue of material fact exists in this case as to whether it owed the Millers a duty to upgrade its stormwater-drainage system. As a result, it contends that the trial court should have entered a summary judgment in its favor.

<u>I. Does a Municipality Owe an Individual Duty to a Property Owner with Regard to Stormwater Drainage?</u>

In the present case, the Millers alleged negligent-maintenance,

nuisance, and trespass[10] claims against the City.[11] "Part of the courts' traditional role when hearing a tort claim [against a municipality] is to determine the scope of a municipality's duties and to whom those duties are owed." Britt v. City of Hoover, [Ms. SC-2024-0530, May 16, 2025] ____ So. 3d ___, ___ (Ala. 2025) (Mitchell, J., concurring specially) (citing DiBiasi v. Joe Wheeler Elec. Membership Corp., 988 So. 2d 454, 460 (Ala. 2008) (stressing that "'"the existence of a duty is a strictly legal question to be determined by the court."'" (citations omitted))). "After all, for a plaintiff to successfully bring a claim in tort, there must first be an

_____

[10]Although the Millers allege a trespass claim in their amended complaint, in substance their claim is an indirect-trespass claim because they are alleging that the stormwater surcharging from the City's overwhelmed stormwater-drainage system is interfering with their use and enjoyment of their property. See Borland v. Sanders Lead Co., 369 So. 2d 523, 530 (Ala. 1979) (explaining that "[f]or an indirect invasion to amount to an actionable trespass, there must be an interference with plaintiff's exclusive possessory interest; that is, through the defendant's intentional conduct, and with reasonable foreseeability, some substance has entered upon the land itself, affecting its nature and character, and causing substantial actual damage to the res").

[11]We note that an inverse-condemnation claim was not pleaded and, thus, we do not consider the question of whether the flooding here was so severe as to constitute a taking under the Alabama or federal constitutions. See generally Long v. City of Athens, 24 So. 3d 1110, 1116-19 (Ala. Civ. App. 2009) (discussing such a claim in the context of flooding but finding it barred by the statute of limitations).

underlying duty owed <u>to the plaintiff</u>." <u>Id.</u> (citing <u>Macrum v. Security Tr. & Sav. Co.</u>, 221 Ala. 419, 421, 129 So. 74, 76 (1930) (noting that it is "axiomatic that there can be no tort action maintained except against one who owed a duty fixed by law to the plaintiff")).

To be entitled to a summary judgment on their negligent-maintenance and nuisance claims, the Millers had to show that the City owed them some sort of duty to upgrade its stormwater-drainage system. <u>See, e.g.</u>, <u>Harris v. Board of Water & Sewer Comm'rs of City of Mobile</u>, 294 Ala. 606, 612, 320 So. 2d 624, 629 (1975) (recognizing that, in order to establish a negligent-maintenance claim in Alabama, the plaintiff must prove the existence of a duty owed by the defendant); and <u>Tipler v. McKenzie Tank Lines</u>, 547 So. 2d 438, 440 (Ala. 1989) (recognizing that a plaintiff must prove the tort elements of duty and causation in order to make a prima facie case of nuisance). Absent such a showing, not only must their negligent-maintenance and nuisance claims fail, but their indirect-trespass claim must also fail. <u>See</u> <u>generally</u> <u>Royal Auto., Inc. v. City of Vestavia Hills</u>, 995 So. 2d 154, 160 (Ala. 2008) (holding that "because the businesses' negligent-maintenance claims fail, their nuisance and trespass claims must also fail").

It does not appear that our Court's caselaw has ever directly addressed whether a municipality owes a duty to an individual property owner to <u>upgrade</u> a stormwater-drainage system or if such a duty is instead owed only to the public at large. Thus, we must first determine what kind of duty is owed by a municipality under circumstances like those presented in this case before determining whether the trial court should have entered a summary judgment in the City's favor.

### A. Alabama Law Imposes No Duty at All For A Municipality to Build A Stormwater-Drainage System

Section 11-50-50, Ala. Code 1975, authorizes municipalities to construct and maintain drainage systems, including stormwater-drainage systems. Specifically, that statute states:

> "All cities and towns may make all needful provisions for the drainage of such city or town, may construct and maintain efficient sanitary and stormwater sewers or sewer systems, either within or without the corporate limits of the city or town, may construct and maintain ditches, surface drains, aqueducts, and canals and may build and construct underground sewers through private or public property, either within or without the corporate limits of such city or town, but just compensation must first be made for the private property taken, injured, or destroyed."

Although our Court has recognized that such authority exists for municipalities under Alabama law, we have also stated that "'a

28

municipality is not <u>required</u> to exercise this authority.'" <u>Lee v. City of Anniston</u>, 722 So. 2d 755, 757 (Ala. 1998) (quoting <u>City of Mobile v. Jackson</u>, 474 So. 2d 644, 649 (Ala. 1985)). In particular, we have stated that "[i]n general a municipality has no duty 'to provide and maintain proper drainage of surface water from a resident's property to prevent flooding and damage to the property.'" <u>Kennedy v. City of Montgomery</u>, 423 So. 2d 187, 188 (Ala. 1982) (quoting <u>Hendrix v. Creel</u>, 292 Ala. 541, 545, 297 So. 2d 364, 367 (1974)).

Rather, we have recognized that the decision to "provide and maintain proper drainage" -- that is, the decision to build or not to build a drainage system -- "'is a <u>function committed to the municipality which calls for the exercise of governmental discretion</u>.'" <u>Kennedy</u>, 423 So. 2d at 188 (quoting <u>Hendrix</u>, 292 Ala. at 545, 297 So. 2d at 367). We have also stated that, generally, we will not interfere with a municipality's discretion to build or not to build a stormwater-drainage system. <u>See</u> <u>Hendrix</u>, 292 Ala. at 545, 297 So. 2d at 367 ("Courts, above all others, are charged with a very sacred duty not to encroach upon the domain of other departments of government under our constitutional system of government." (citing <u>Finch v. State</u>, 271 Ala. 499, 124 So. 2d 825 (1960))).

### B. If the Municipality Does Construct a Drainage System, It Owes a Duty to Individuals Not to Negligently Design, Construct, or Maintain that System

However, if a municipality does decide to construct such a drainage system, our Court has stated that it "'may be liable for damages caused by its negligence.'" Lee, 722 So. 2d at 757 (quoting City of Mobile, 474 So. 2d at 649). "To undertake this service … is to assume a measure of legal duty in its performance" because city officials are acting "in the performance of ministerial rather than government functions" and this is "analogous to that involved in the construction and maintenance of streets …." Sisco v. City of Huntsville, 220 Ala. 59, 60, 124 So. 95, 95-96 (1929) (emphasis added). "This reflects the familiar tort principle that liability may arise from the negligent performance of a voluntary undertaking." Kennedy, 423 So. 2d at 189 (emphasis added).

We have consistently recognized that the type of negligent conduct that can subject a municipality to liability with regard to drainage includes its failure to properly design, construct, or maintain its sewer and drainage systems. See, e.g., Kennedy, 423 So. 2d at 189 (reversing a summary judgment in favor of the city and holding that a genuine issue of material fact existed as to whether the city's failure to provide

30

adequate drainage to prevent the plaintiffs' basement from flooding amounted to negligent maintenance and constituted a breach of its duty under § 11-50-50); cf. Long v. Jefferson Cnty., 623 So. 2d 1130 (Ala. 1993) (holding that a county could be liable for the negligent construction or maintenance of its sewer across an easement on an individual homeowner's property).

The Millers have not alleged that the original design or construction of the drainage system was negligent or that the City would be responsible for any such negligence should it exist. In fact, in their reply brief in support of their motion for a partial summary judgment, the Millers made clear that they did not pursue a negligent-design or negligent-construction claim against the City in this case. See C. 894 (stating that they "did not pursue a negligent design or construction claim …."); C. 905 (stating that the Millers "have never contended that the drainpipes at issue were negligently designed and/or constructed. Such a claim is not found in [the Millers'] Amended Complaint, [the Millers'] testimony, or [the Millers'] motion for summary judgment because it is simply not true."); C. 890 (stating that "the City's strategy is to (improperly) recast [the Millers'] negligent maintenance claim as a

31

negligent design or construction claim in an effort to avoid liability. Yet, [the Millers] are the masters of their complaint (which does not contain the words 'design' or 'construction' let alone a cause of action for negligent design or construction) and the City cannot rewrite [the Millers'] complaint to avoid liability."); C. 893 (noting that "the City moved for a summary judgment on negligent design and construction -- a cause of action that is not asserted in this case").

Instead, the Millers expressly argue that the City negligently failed to upgrade the stormwater-drainage system, which they argue is negligent maintenance of the drainage system. See C. 905 (explaining that their "claim that the drainpipes at issue are no longer adequate (negligent maintenance) is different from a drainage system being inadequate at the time the infrastructure was built (negligent design or construction claim)" (emphasis added)).

Specifically, they argue that, even though the stormwater-drainage system was adequately sized in the past, it has become inadequate. They argue that the City knew its system was no longer adequate to handle the amount of stormwater being drained through it because of increased development throughout the City over time. They say that a failure to

expand or upgrade the system under such circumstances is a classic example of negligent maintenance for which the City owes them a duty. See C. 925 (citing Rodney Miller's deposition in which he explained that their claim against the City "is based off the fact that while the pipe may have -- the <u>drainage system may have been sufficient to handle capacity at one point in time</u>; over time, there has <u>been development</u>, and there is a larger amount of water being directed to it. And <u>because of that, the pipes are over -- are undersized.</u>" (emphasis added)); C.906 ("Plaintiffs even presented testimony from an expert that drainpipes are selected based on the level of development when they are installed, which means that drainpipes that are sufficient when installed may <u>no longer be adequate today because of the subsequent development</u> and resulting increase in impervious surface space." (emphasis added)); C. 906 (noting that the Millers "do not allege that the drainpipes at issue were improperly designed or constructed nor do [they] allege that the drainpipes were collapsed, obstructed, or clogged. Rather [the Millers] allege that the drainpipes at issue are <u>no longer adequate.</u>" (emphasis added)).

> i. The Decision Not To Upgrade or Expand a Stormwater-Drainage System Is Not Equivalent to

33

<u>Negligent Maintenance</u>

The City disputes that the failure to upgrade or expand a drainage system is equivalent to a failure to maintain that drainage system. In support of its position, the City relies in part on our Court's prior decision in <u>Byrd v. City of Citronelle</u>, 937 So. 2d 515 (Ala. 2006), and the Court of Civil Appeals' decision in <u>Long v. City of Athens</u>, 24 So. 3d 1110 (Ala. Civ. App. 2009).

In <u>Byrd</u>, <u>supra</u>, a drainage ditch ran across a portion of Byrd's property that received water from surrounding areas. At some point, the drainage ditch began to "back up" and flood Byrd's property in excessive rain events. 937 So. 2d at 517. When the flood water receded, it carried with it some topsoil from Byrd's property, and her property began to erode. Byrd then sued the City of Citronelle, alleging, among other things, that the city negligently maintained the ditch.

In support of her negligent-maintenance claim against the City of Citronelle, Byrd offered the affidavit testimony of an expert witness, who "name[d] three specific circumstances that he allege[d] evidence[d] a breach of the City's duty to adequately maintain the ditch: (1) obstructions in the ditch, (2) obstruction of the driveway pipes, and (3)

34

improper sloping of the ditch." Id. at 521. In determining that none of those conditions identified by Byrd's expert witness indicated negligent maintenance, our Court stated that an obstruction in the ditch was not necessarily the result of the negligent maintenance thereof. Id. at 522 (discussing Locke v. City of Mobile, 851 So. 2d 446, 450 (Ala. 2002), and observing that our Court has "stated that an obstruction in a ditch 'does not necessarily mean negligent maintenance'").

The Court also specifically noted that the allegation of a "the lack of proper slope of the ditch along with the respective driveway culverts" were "clearly matters of design or construction" rather than "maintenance" and, therefore, were barred by the statute of limitations. Id. We therefore affirmed the summary judgment in favor of the City of Citronelle on Byrd's claims. While not directly reaching the question, Byrd implies that negligent maintenance is not the same as negligent failure to upgrade.

More directly, in Long, supra, the Longs brought an action against the City of Athens alleging claims of negligence, trespass, nuisance, and inverse condemnation due to alleged flooding of their property by the city. The Longs purchased approximately 31.5 acres of unimproved property

35

in Athens in 1957, which over time became surrounded by subdivisions, leading to increased water flow onto their property. The Longs claimed that the city's drainage systems were responsible for diverting water onto their land and that the City had a duty to upgrade its systems to prevent this from continuing to happen. The City of Athens eventually filed a motion for summary judgment, and the trial court granted the city's motion.

On appeal, the Court of Civil Appeals rejected the argument that the City of Athens had a duty to upgrade the drainage system because such a claim was not a claim alleging failure to maintain. The Longs had alleged that there had been drainage studies submitted to the city that detailed the increased flow of water traveling across the Longs' property and that the city had failed to follow the recommendations of those studies. Further, they alleged that, by failing to update the drainage systems to accommodate the increased discharge of surface water from the developments surrounding the Longs' property, the city had failed to maintain those systems. Id. at 1115 ("The Longs' theory of recovery for their claim of negligent maintenance is that, by failing to update the drainage systems to accommodate the increased discharge of surface

36

water from the developments surrounding the Long property, the City failed to maintain those systems." (emphasis added)).

Relying on our decision in Byrd, the Court of Civil Appeals explained that the failure to "enlarg[e] the culverts" and require new retention ponds -- per the recommendations of various studies conducted on the city's drainage systems -- were not negligent maintenance. Id. at 1116. Because the Longs failed to present substantial evidence that the City of Athens did not adequately maintain its drainage systems, the Court of Civil appeals affirmed the trial court's summary judgment in favor of the city on the Longs' negligent-maintenance claim. Id.

The Millers do not address Byrd or Long. More importantly, they also do not point us to any caselaw expressly establishing (1) that a failure to upgrade is equivalent to negligent maintenance of a drainage system or (2) that a municipality owes a duty to an individual to upgrade a stormwater-drainage system.

Instead, the Millers rely on our Court's prior decision in Reichert v. City of Mobile, 776 So. 2d 761 (Ala. 2000), in which homeowners in the Greenwich Hills subdivision in Mobile sued the City of Mobile after their properties were flooded. They alleged negligent design, negligent

construction, negligent maintenance, continuing trespass, and continuing nuisance, all related to the city's stormwater-drainage system. The Mobile Circuit Court entered a summary judgment in favor of the city, and the homeowners appealed.

On appeal, the plaintiffs argued, among other things, that the City of Mobile failed to maintain the system properly, resulting in continued flooding. The plaintiffs presented expert testimony from licensed professional engineer who opined, among other things, that subsequent development in the area had overburdened the stormwater-drainage system.

Our Court reversed, in part, the summary judgment in favor of the City of Mobile on the plaintiffs' negligent-maintenance claim after determining that genuine issues of material fact existed as to whether the City of Mobile had failed to provide appropriate upkeep of the stormwater-drainage system.

The Millers' contend that Reichert is applicable here because the failure to upgrade a stormwater-drainage system is the same as the failure to upkeep that system and is, thus, a form of negligent maintenance. However, in Reichert, the claim that survived related to

the City of Mobile's duty to <u>upkeep the pipes at issue in their existing condition -- not a failure to upgrade the pipes</u>.  Specifically, our Court explained:

> "Although the negligent-maintenance claims are not barred by the statute of limitations, the plaintiffs still must present substantial evidence of negligent maintenance in order to avoid the entry of a summary judgment against those claims. In other words, they must present evidence from which a jury could reasonably conclude that the flooding of their property was <u>proximately caused by the City's failure to provide appropriate upkeep for the storm-drainage system in its existing condition</u>, <u>see</u> <u>City of Birmingham v. Leberte</u>, [773 So. 2d 440 (Ala. 2000)], rather than by the City's failure to correct any alleged design or construction problems with the that system, <u>see</u> <u>Williams v. Board of Water & Sewer Comm'rs of the City of Prichard</u>, 763 So. 2d 938 (Ala. 1999)."

776 So. 2d at 765-66 (emphasis added).  Our Court also noted that one plaintiff testified that the drain near to her home "stopped up big time," requiring a vacuum truck from the city, and that another plaintiff testified that, when she contacted the city regarding the sewer line that needed to be pumped out, "sometimes the City would not respond." <u>Id.</u> at 763-64.

In sum, it appears that our Court has never directly decided whether a failure to upgrade is equivalent to negligent maintenance.  In our view, the decision to upgrade seems to be synonymous with "mak[ing]

39

all needful provisions for ... drainage" because that decision involves taking multiple public-policy factors into consideration in choosing to build stormwater drainage. See, e.g., § 11-50-50 (providing that municipalities are authorized by law to "make all needful provisions for ... drainage" through the construction of "stormwater sewers" (emphasis added)). For instance, upgrading a drainage system would involve the expenditure of new capital funds to buy new pipes -- pipes that are larger. It would also involve the expenditure of new capital funds to install those new, larger pipes and (potentially) to engage in other expansions of the system. See, e.g., C. 362 (the Millers' motion for a summary judgment arguing that the stormwater pipes are "undersized" and that "replacing the undersized pipes" should be ordered).

The decision to upgrade -- that is, to build new and larger pipes -- is different in kind from simply keeping and maintaining the existing system. In other words, the decision to upgrade a drainage system -- like the decision to build a drainage system in the first place -- appears to be an exercise of governmental discretion. This is a question for the political branches of government, which must balance the competing needs and the competing desires of their voters with the need for drainage. See, e.g.,

<u>Hendrix</u>, 292 Ala. at 545, 297 So. 2d at 368 (stating that a municipality must make a "'determination of the necessity and requirements of public accomplishment'" regarding whether to build a drainage system (citation omitted)).

Based on the foregoing, we conclude that upgrading a drainage system, like constructing one, is a decision that has community-wide impact, thus implicating a duty owed to the public as a whole and not to individual property owners. As explained above, the decision to upgrade a drainage system involves prioritizing funding for competing improvement or development projects that may be needed in the municipality. It also involves considerations of how such projects may impact citizens in other parts of the municipality.

Subjecting a municipality to tort liability "'in those narrow areas of governmental activities essential to the well-being of the governed'" would "'materially thwart the [municipality's] legitimate efforts to provide such public services'" in the first place. <u>Ex parte City of Orange Beach</u>, 430 So. 3d 41, 47 (Ala. 2025) (quoting <u>Rich v. City of Mobile</u>, 410 So. 2d 385, 387 (1982)) (emphasis omitted). Our Court has held that a municipality does not generally owe a duty to an individual plaintiff for

41

any public service that "provide[s] for the public's safety, health, and general welfare" because such services arise out of a duty to the public as a whole and not to an individual plaintiff. Ex parte City of Muscle Shoals, 384 So. 3d 37, 44 (Ala. 2023). It seems logical to this Court that the decision to expand or upgrade a stormwater-drainage system is akin to a decision to provide a public service "for the public's safety, health, and general welfare" such that any duty related to the upgrade or expansion of that system is a duty owed to the public as a whole. See id. at 41-44.[12]

### ii. The Record Supports the Conclusion that the Decision Whether to Upgrade a Stormwater-Drainage System Is Not Equivalent to Negligent Maintenance

The record before us indicates that any upgrade the City made to the system would impact not only the Millers but also other residents.

For instance, the record contains a copy of Schoel Engineering's 2022 report, which indicated that, in order to mitigate, but not fix, the

---

[12]We recognize that the two cases on which we rely here -- Ex parte City of Orange Beach, 430 So. 3d 41 (Ala. 2025), and Ex parte City of Muscle Shoals, 384 So. 3d 37 (Ala. 2023) -- were decided based on substantive immunity and our Court's prior decision in Rich v. City of Mobile, 410 So. 2d 385 (1982). Because we choose to resolve this case based on traditional tort principles, we need not reach the question of whether the doctrine of substantive immunity applies to stormwater drainage.

flooding problems occurring around the community, the City would have to make major changes to its drainage system -- not just near the Millers' property -- including undertaking a three-phase project costing $3,944,000 that would require it to dig up and replace all of its pipes and drain inlets across the City. In his affidavit produced by the City, Walter Schoel, the senior principal engineer with Schoel Engineering, noted that "the implementation of the drainage improvement project would likely cause downstream impacts" and, as a result, that "the project would have to be extended downstream to mitigate the expected impacts, which would have significantly increased the overall cost of the project."[13]

The Millers' complaint likewise expressly relied on those studies and demanded changes to the drainage system based on those studies. See C. 95 (alleging that "[the City's] stormwater drainage system is no longer adequate"); C. 99-100 (noting Schoel Engineering's report and arguing that report showed that "pipes are undersized" but that the City had failed to adopt the recommendations for its "drainage system"); C. 102 (alleging that the City's "drainage system… is no longer adequate");

---

[13]In fact, one Schoel engineer, David Hains, opined that there were "not any improvements the City could perform which would solve the flooding problems at [the Millers' property]."

C. 102 (alleging that the City's "drainage system has become overloaded"); and C. 103-04 (requesting an injunction because the City had not followed recommended remedial measures by School Engineering and Hill Engineering).

The Millers' motion for a summary judgment also relied expressly upon those studies in arguing that School Engineering issued a "report informing the City that its stormwater drainage infrastructure is 'aging' and 'struggl[ing] to safely convey stormwater'" and that development within the City was adding "pressure" and "further tax[ing]" the "already strained stormwater drainage systems and exacerbat[ing] the drainage problems." And, the trial court relied upon those expert reports about the drainage system in rendering its judgment in favor of the Millers below. See C. 1158 ("Despite… receiving reasonable remediation design plans from the engineering firm it retained, [the City] has failed to provide appropriate upkeep of its drainage system.").

In response, the City produced substantial evidence that those studies were met with extreme resistance from citizens who objected on the basis that if additional water were added to stormwater infrastructure located near their downstream properties, as School

Engineering's study projected, then "the damage will be extraordinary." Those citizens further claimed that the project would "harm many more residents than it will help" and that they "will have no choice but to utilize all available legal remedies."

Given the community-wide impacts that the expansion or upgrade of the City's stormwater-drainage system could create, it is evident to this Court any such action is connected to "the City's responsibility to provide for the public's safety, health, and general welfare" that goes to the City's duty to the public at large and not specifically to the Millers.[14] Ex parte City of Muscle Shoals, 384 So. 3d at 44. "To hold otherwise would impermissibly transform the City's duty to the general public, which is enforced through democratic politics, into a legal duty owed to individuals, which is enforced by courts." Britt, ___ So. 3d at ___ (Mitchell, J., concurring specially). "It would also excessively burden the City's 'broa[d] requirement ... to provide for the public health, safety, and

---

[14]We need not decide whether the citizens who have objected were correct about these impacts. The intensity of these objections merely illustrates the legal point that whether to upgrade the drainage system is not equivalent to simply maintaining the system. Whether to upgrade the system is a decision about building; it is a political decision involving weighing competing concerns about which the citizens of the municipality are entitled to have a say through their elected city council.

general welfare of its citizenry,' thereby limiting its practical ability to do so." Id. (quoting Rich, 410 So. 2d at 387). Indeed, as the City noted in its reply to the Millers' response to its motion for a summary judgment:

> "[The Millers'] theory of liability that a city's failure to upgrade stormwater infrastructure is tantamount to 'negligent maintenance' would effectively … allow plaintiffs to repeatedly sue municipalities many decades after stormwater infrastructure was constructed, and after numerous prior flooding events, based on a theory that it needed to be redesigned and reconstructed to present day standards (or beyond those standards). Cities would be liable under this theory even if they had maintained their stormwater drainage infrastructure appropriately and not allowed any obstruction, clogs, or collapsed pipes to impede the flow of water. And cities would be under a constant duty to upgrade all older components of their stormwater infrastructure every time standards changed."

In other words, were we to broadly construe "negligent maintenance" to include upgrading, as the Millers suggest, municipalities would understandably be hesitant to undertake certain public services at all. This is an outcome that must be avoided.

### iii. Prior Drainage Cases from Our Court are Consistent with Our Conclusion Here

In concluding that there is no duty owed to individual plaintiffs by a municipality to affirmatively expand or upgrade a drainage system because such a duty is owed to the public at large, we should not be

46

understood as  disturbing any of the precedent that imposes a duty on municipalities to individual plaintiffs when the municipality negligently designs, constructs, or maintains its stormwater-drainage system and that system damages the plaintiffs' property. See, e.g., City of Muscle Shoals, 384 So. 3d at 44 (discussing Kennedy v. City of Montgomery, 423 So. 2d 187 (Ala. 1982)); Long v. Jefferson Cnty., 623 So. 2d 1130 (Ala. 1993); City of Mobile v. Jackson, 474 So. 2d 644 (Ala. 1985)).

As noted above, in asserting that the City owed them a duty to upgrade its stormwater-drainage system so as not to further flood their property, the Millers primarily rely on our Court's prior decision in City of Mountain Brook v. Beatty, 292 Ala. 398, 295 So. 2d 388 (1974).

In Beatty, the plaintiffs built their home around 1949 or 1950, at which time an old 24-inch storm sewer existed, which was later replaced by a 36-inch brick storm sewer by the City. This sewer emptied into a brook traversing the plaintiffs' property, which was part of the City's stormwater-drainage system. Over time, the drainage system caused erosion and flooding on the plaintiffs' property, especially during heavy rains. Additionally, raw sanitary sewage was noticed in the ditch about five years before the litigation began.

47

The City began constructing new underground pipes to improve the drainage system, which included a new 36-inch pipe that would increase the water flow into the ditch. The plaintiffs sought injunctive relief to stop the construction and a declaration of rights regarding the use of the drainage ditch, claiming that the City's actions amounted to a nuisance. The trial court granted an injunction against the proposed system but allowed the City to install a different system and granted the City an easement for such construction. The City appealed, and the plaintiffs filed a cross-appeal.

On appeal, our Court explained that the key issue was whether the City had the right to drain water across the plaintiffs' property and, if so, the extent of that right. In support of that conclusion, our Court explained:

> "The general principles have been succinctly stated as follows:
>
> > "'An easement of drainage through a ditch to or across the land of another may be acquired by prescription, and the principles and requisites of the acquisition of an easement by prescription in a private way apply. In order to acquire the right, the use must have extended the required time, and must have been adverse, peaceable, uninterrupted, and under a claim of right. … The

ditch or drain must have been an apparent, open, visible, or notorious encumbrance; and there must have been an actual occupation by the flow of water.'

"93 C.J.S. Waters § 121, at 821-22. See also Acadia-Vermilion Rice Irrigating Co. v. Broussard, 175 So. 2d 856 (Ct. App. La. 1965); Riggs v. Ketner, 299 Ky. 754, 187 S.W.2d 287 (1945); Hargraves v. Wilson, 382 P.2d 736 (Okl. 1963).

"In Alabama the prescriptive period is 20 years. Fitts v. Alexander, 277 Ala. 372, 170 So. 2d 808 (1965). In Stearnes v. Woodall, 218 Ala. 128, 117 So. 643 (1928), this court outlined the following requisites for establishing title by prescription:

"'[T]he elements on which the doctrine of prescription is applied differ from those of adverse possession. In the first there must be an individual, continuous possession of user without the recognition of adverse rights, for a period of 20 years, and upon establishment of such claim and user, the law presumes the existence of all the necessary elements of adverse possession or title without fuller proof. …'"

292 Ala. at 403, 295 So. 2d at 391-92.

Our Court explained that for more than 20 years there had been a city drainage pipe emptying into the ditch on the plaintiffs' adjacent property. Based on that evidence, our Court held that it was clear that the City had acquired a prescriptive drainage easement across the plaintiffs' property.

Although our Court found that the City had an easement for drainage, our Court also stressed that we were not implying that the City possessed the right to flood the plaintiffs' property. We made clear that "[t]he prescriptive right to drain carries with it the corresponding <u>duty to maintain</u> the ditch in such a condition that the water cast in the ditch by the city [does] not cause it to overflow." 292 Ala. at 406, 295 So. 2d at 394 (emphasis added). Thus, our Court upheld the injunction against the City. <u>Id.</u>

At first blush, it may seem as though <u>Beatty</u> is indistinguishable from the present case. However, unlike in <u>Beatty</u>, the Millers' allegations against the City concern its failure to maintain its broader stormwater-drainage <u>system</u>, not just the portion of the system within the easement that runs over their property.

Additionally, in <u>Beatty</u>, our Court's holding was clearly based on the principle that a municipality has a "<u>duty to maintain</u>" its drainage easement in such a way that it does not overflow onto an adjoining landowner's property. In fact, <u>Beatty</u> not only uses the term "duty to maintain" at least three times, it also cites and quotes a Georgia case relating to the "duty to maintain" in support of its conclusion. <u>See</u> 292

50

Ala. at 405, 295 So. 2d at 394 (citing and quoting <u>City of Atlanta v. Williams</u>, 218 Ga. 379, 128 S.E.2d 41 (1962)).

Also, unlike <u>Beatty</u>, here, the City provided substantial evidence that it did not negligently maintain its system. For instance, the City offered evidence that it was undisputed that the City's drainpipes and drain inlets -- which have been in place since 1928 -- have never been found to have any maintenance issues. In the aftermath of the flooding event, the City noted that an evaluation of its drainpipes and drain inlets (including a video analysis) did not reveal any cracks or structural issues with its system or blockages. The Millers did not offer any evidence to the contrary.

Because there is nothing in the record that indicates that the City negligently maintained its stormwater-drainage system, there is no genuine issue of material fact in this case as to whether it owed an individual duty to the Millers to upgrade that system. This conclusion is consistent with prior drainage cases from our Court, including <u>Beatty</u>. See, e.g., <u>City of Mobile v. Jackson</u>, and <u>Kennedy v. City of Montgomery</u>, <u>supra</u> (both recognizing that it is only when a municipality has negligently constructed or maintained its drainage system that a duty

may be owed to an individual plaintiff).

Conclusion

In making decisions about stormwater-drainage systems, their location, capacity, and effectiveness, several competing and compelling strategies must be considered by a municipality. Balancing these interests requires an elected body to apply discretion. Whether to upgrade the stormwater-drainage system is subject to these same constraints.

In this case, we are essentially being asked to review decisions made by a municipality and to fashion a remedy that would benefit one property owner but would impact other property owners who are not parties to the litigation and could be disproportionately impacted by the remedy that is being sought. This is something we cannot do. Absent any evidence of wrongdoing on the part of the municipality, the best we can do is to construe its actions -- or, in this case, lack of action -- as the best expression of what is right for all property owners within the community.

Because the City presented substantial evidence that no genuine issue of material fact existed as to whether it owed the Millers an individual duty to upgrade its stormwater-drainage system, it was

entitled to a summary judgment in its favor on their tort claims. As a result, the permanent injunction against it also cannot be upheld. See generally City of Birmingham v. City of Fairfield, 375 So. 2d 438, 442 (Ala. 1979) (plurality opinion) (recognizing that "the drastic remedy of abatement by injunction is not available to an injured party unless the authorized instrumentality was negligently constructed or maintained"). Accordingly, we reverse the trial court's summary judgment and permanent injunction in favor of the Millers and remand the case for that court to enter a summary judgment in the City's favor on that basis.[15]

REVERSED AND REMANDED.

Stewart, C.J., and Wise, Cook, McCool, JJ., concur.

Sellers and Parker, JJ., concur specially, with opinions.

Shaw, Bryan, and Mendheim, JJ., concur in the result.

---

[15]Because we find this issue to be dispositive in this case, we pretermit discussion of any other issues raised by the parties on appeal. See Jackson Hosp. & Clinic, Inc. v. Murphy, 343 So. 3d 490, 498 n.3 (Ala. 2021) (pretermitting discussion of remaining issues on appeal after determining a dispositive issue).

SELLERS, Justice (concurring specially).

I concur with the main opinion. I write specially, however, to point out the deference a court should give to a locality's decision in fashioning a remedy affecting multiple property owners.

Water is a curious liquid; while essential for life, it can cause death and destruction when concentrated and seeks its level. For this reason, under the common law, water was treated as a common enemy. This was so because, when water caused great damage to property, landowners were allowed to defend their property from flooding occasioned by extraordinary rain. But property is rarely level, and, as water flows downhill, one property owner fending off water can cause damage to an adjacent property owner. Thus, from a practical standpoint, lower land is and always will be subservient to higher land when surface water flows from the higher to the lower. That is a law of gravity that even a court cannot suspend by order, injunction, or decree. But, for property to become useful based on location, for its highest and best use, the effects of water can be mitigated by mutual agreement between landowners, whether adjacent, adjoining, upstream, or downstream. Organized property owners in a political subdivision combine their resources to

develop strategies to allow water to drain in a manner that causes the least amount of damage to all the property owners. Decisions about the logistics of drainage are political in nature, as defeating a common enemy benefits all citizens. But, in making decisions about storm sewers, their location, capacity, and effectiveness, several competing and compelling strategies must be considered by coalitions contained in a political subdivision of the affected property owners. And balancing these interests requires finding the best solution from any number of good solutions. Such is the nature of government. Like all decisions, some property owners may be impacted disproportionately, but if the overall decision benefits the majority, that action is generally acceptable. In cases like this one, we are essentially being asked to sit in equity and review decisions made by a political subdivision and the impact of that decision on a single property owner. But as a court, we simply cannot fashion a remedy to benefit one property owner that would impact other property owners who are not party to the litigation, but could be impacted even more disproportionately. The best we can do is to defer to the political subdivision and construe its actions (or in this case lack of action) as the best expression of what is right for all property owners

55

within the political subdivision. Defeating a common enemy requires consideration of any number of strategic alternatives, and this consideration is more critically decided by officials elected from the property owners directly impacted by their decision, not the judiciary. Enjoining a political subdivision to act against a common enemy over which there is no control is always an abuse of discretion. Concomitantly, taking action to benefit only one property owner to the exclusion of others within a community is substituting a court's judgment over and against elected officials, whom we presume to act in the best interests of their community. This we should not do. Thus, when elected officials within a political subdivision render a decision, we should be careful to disturb their decision only when the legality of their actions is apparent. Otherwise, courts would be asked to superintend the decision-making processes of localities, which we are completely unqualified to do. By reversing the summary judgment, we are properly allowing leaders within a political subdivision to take into consideration all the various ways to remedy a problem and to fashion a solution without concern that any potential negative impact occasioned by such a decision could impose cost-prohibitive, court-ordered liability.

PARKER, Justice (concurring specially).

I concur with the main opinion's result and core reasoning. I write separately to highlight a key doctrinal point: Our decision not only is consistent with "traditional tort principles," ___ So. 3d at ___ n. 12, but also fits comfortably with an on-point statute enacted by our Legislature.

In § 11-47-190, Ala. Code 1975, the Legislature has established a default rule of blanket tort immunity for Alabama municipalities. It says that "[n]o city or town shall be liable for damages or injury done to or wrong suffered by any person or corporation." Id. But there are two exceptions to this default rule. One exception -- for failure to remedy known defects in municipal "streets, alleys, public ways, or buildings," id.-- is not particularly relevant here. But the other exception is: Under it, a municipality may be liable if the plaintiff suffered an "injury or wrong" through the "neglect, carelessness, or unskillfulness" of its agents "engaged in work therefor … while acting in the line of his or her duty." Id.

Applying the second exception to the facts of this case seems straightforward to me. The Millers have not contended that any agent of the City of Mountain Brook was "careless" or "unskillful" in his or her

work; at most, their claims turn on the notion of "neglect." But as the main opinion persuasively explains, our precedents point to a meaningful distinction in this context between neglect and a legitimate policy choice, between failing to "keep[] and maintain[] the existing system" and the "decision to upgrade -- that is, to build new and larger pipes." ___ So. 3d at ___. Under that distinction, Mountain Brook's decision not to upgrade its drainage system fails to trigger the immunity exception, and so the default rule of immunity applies to bar the Millers' claims.

As the main opinion suggests, there are good reasons for the result we reach today: To hold otherwise would risk undermining the local democratic process. See ___ So. 3d at ___ (citing Britt v. City of Hoover, [Ms. SC-2024-0530, May 16, 2025] ____ So. 3d ____, ____ (Ala. 2025) (Mitchell, J., concurring specially)). I add only that our decision can be (and, in my view, is) grounded in a decision produced by the state's own democratic process -- namely, the immunity conferred on Mountain Brook by the Legislature through the municipal-immunity statute.